SLICE *v.* CAROZZA PROPERTIES, INC. ET AL.

[No. 90, September Term, 1957.]

*Decided January 22, 1958.*

*George J. Goldsborough, Jr.,* with whom were *Richard A. Mehler* and *Mehler & Goldsborough* on the brief, for the appellant.

*C. Calvert Lancaster,* with whom were *Adrian P. Fisher* and *Fisher & Lancaster* on the brief, for Carozza Properties, Inc., appellee.

*William B. Bowie* for the other appellees.

BRUNE, C. J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Prince George's County dismissing a bill for an injunction to enforce the provisions in a lease granting the complainant the exclusive right to sell alcoholic beverages in the Hillcrest Heights Shopping Center for off-the-premises consumption.[1]

Henry W. Slice, as lessee (complainant-appellant), entered into a lease agreement with Carozza Properties, Inc., (defendant-appellee, usually referred to herein as "Carozza"), the lessor, in which he agreed to rent certain premises for a period of ten years. The lease was dated November 15, 1951, and was recorded November 24, 1952. The sections of the lease that are pertinent here are as follows:

> "1.  That for and in consideration of the covenants, promises and agreements herein contained and the rents hereinafter reserved, the Lessor does hereby lease and demise unto the Lessees, and the Lessees do hereby take and hire from the Lessor, premises known as Store #8, Hillcrest Heights Shopping Center, located at the intersection of Iverson Street and 23rd Parkway, Prince George's County, Maryland, all as more particularly shown on the plan attached hereto and made a part hereof, together with the right of customer use of a parking lot in common with other tenants of Hillcrest Heights Shopping Center, as more particularly set forth on the plans and specifications prepared by E. J. Conner, Architect for the Lessor.
>
> * * *
>
> "7. * * * It is the expressed intention of the Lessor to grant the exclusive merchandising of Beer, Wine and Liquor for off-the-premises 'consumption' in

---

1. In addition, the complainant sought damages from the defendants, but by a pre-trial order entered by the Circuit Court the trial was limited to the issue of whether the complainant was entitled to injunctive relief, reserving for future proceedings the determination of the amount of damages, if any, to be recovered.

the Hillcrest Heights Shopping Center to the Lessee, during the term of this lease."

Store #8 is located in the eastern portion of a tract of land known as Block M, Section 4, Hillcrest Heights (referred to below as "Block M"), consisting of about 9.34 acres, which is bounded on the west by 23rd *Parkway,* and on the south by Iverson Street, and on the east by an extension of 23rd *Place.* In May, 1951, Carozza, the owner of Block M, adopted what was called a plan of subdivision showing the outlines of the entire Block and dedicating 23rd Parkway to public use. This plat does not show the extension of 23rd *Place,* above referred to. During the year 1951 eleven or twelve stores were constructed (two originally projected being combined into one) and were subsequently leased to various tenants. Appellant became the first tenant in possession by occupying Store #8 in December, 1951. Thereafter, during 1954 and 1955 a number of additional stores were erected in Block M, adjacent to the twelve stores (as we shall refer to them) built in 1951. The two groups of structures are separated by 54 feet. One of the additional stores built in 1954-1955 was leased by Carozza to Gina's Italian Restaurant, Inc. (referred to hereafter as "Gina's"), another of the appellees in this case,[2] for use as a restaurant, with a clause in the lease restricting the tenant in its sales of beer and light wines to "on sale" only, *i. e.,* Gina's was authorized to sell beer and wines only for consumption on the premises. This lease was dated March 18, 1955. Appellant alleged in his amended bill of complaint that Carozza was instrumental in obtaining an alcoholic beverage license for Gina's, that ever since the restaurant has been in operation it has sold alcoholic beverages not only for consumption on the premises but also for consumption off the premises, and that Carozza has refused to prevent this practice by

2. The other defendant-appellees are persons sued individually as officers of Gina's and as holders of the alcoholic beverage license issued for the premises occupied by Gina's Italian Restaurant, Inc. They are Josephine Marletta, Joseph Masero, Sandra Malone and Alton L. Malone.

Gina's. These allegations as to package sales by Gina's for off-premises consumption were admitted by Gina's and all the individual defendants, but were denied by Carozza as part of a blanket denial of several allegations relating to violations of the lease to the appellant. The evidence includes a photograph of Gina's showing in the window a sign stating that "We serve beer and light wine on and off sale daily and Sunday." This photograph was taken in October, 1955, about two months before Carozza filed its answer to the bill of complaint.

The principal question is whether the exclusive license to sell beer, wine and liquor for off-the-premises consumption granted to the appellant, Slice, is limited to the area of the original twelve stores of Hillcrest Heights Shopping Center or extends to the more recently developed area sometimes called "Addition to Hillcrest Heights Shopping Center" and sometimes (as in Gina's lease) called "Second Section Hillcrest Heights Shopping Center." The appellant maintains that the restriction extends to all parts of, or additions to, Hillcrest Heights Shopping Center constructed on Block M, whether included in the original twelve stores or not. The appellees contend that the old and the new are two separate and distinct shopping centers, that the new center was not contemplated in 1951 and is not covered by the restrictive covenant in the appellant's lease.

The solution of the problem is made no easier by the fact that, despite the recital in Paragraph 1 of the appellant's lease, no copy of any plat or plan whatever was attached to the appellant's copy of the lease. No copy of the lease with a plan attached was produced by either side, and it does not appear that a plat or plan was attached to any of the three executed counterparts of the lease. A considerable part of the testimony at the trial concerned the question of what plan or plat was referred to in paragraph 1 of the appellant's lease or was intended to have been annexed thereto.

The appellant testified that at the time he signed the lease, he saw plans indicating that Store #8 was to be a part not only of the twelve stores existing at that time but also of substantial future additions to the shopping center which

were indicated on the plans. He denied having seen the plat called "Defendant's Exhibit C" (referred to below as "Exhibit C") prior to signing the lease.

A Mr. Holmes, who was employed by the rental agency representing Carozza in 1951 (and also in 1955) was called as a witness on behalf of Carozza. He was asked "whether or not there was any plan in being or in existence contemplating additional shopping area at the time the lease was entered into with Slice on November 15, 1951." He answered: "There certainly were no plans in existence other than the plans for the 12 units, 12 store units." At a later stage he was asked: "Is it your testimony * * * that at the time the Slice lease was negotiated, there was no commercial construction in contemplation except those 12 stores * * *?" He replied: "That is correct. There was no contemplated construction except the 12 stores." Although Mr. Holmes' emphasis upon plans in existence and upon the word "construction" seems to suggest that he was speaking of plans for more or less immediate construction rather than of plans for future development, and his responses to questions relating to the development of the so-called second section seems to carry a suggestion that he regarded a plan as referring to drawings prepared for construction which was about to begin, both the Chancellor and the appellant evidently took his testimony as indicating that in 1951 there were no plans or even proposals for a more extensive shopping center in the future than the original twelve stores. We shall assume the correctness of that interpretation.

The appellant sought, on rebuttal, to show through a Mr. Crozier, who had been an officer of an improvement or citizens' association in 1950 and 1951, that prior to the execution of the appellant's lease, Carozza or its agents had exhibited to the association plans for a projected shopping center on Block M at variance with Mr. Holmes' evidence as to what was projected. The Chancellor excluded the proffered evidence.

Mr. Holmes also testified that large scale plans were drawn by E. J. Conner, Carozza's architect, "to enable us to analyze the placement of fixtures, things of that sort in a given store

area," that they worked from such plans, that Exhibit C was a direct photostat of a small sized tracing also made by the architect, that this tracing was drawn from a large scale plan and was prepared for the purpose of supporting the leases, that Exhibit C "is the plot plan referred to in the lease and is the plot plan in support of Mr. Carozza's copy of the lease." The positiveness of this testimony was much weakened by Mr. Holmes' subsequent testimony, and we find his testimony as to what was actually before Mr. Slice when the lease was executed and as to when Exhibit C was shown to Mr. Slice both confused and confusing. The lease was executed on November 15, 1951; Exhibit C is dated November 16, 1951. At one point Mr. Holmes admitted that it would have had to have been shown to Mr. Slice on or after November 16th. At another point he asserted that the plot plan, by which he apparently meant the large scale plan from which Exhibit C was derived, was in existence before November 16th. He also asserted that it was immaterial whether the tracing from which Exhibit C was made was actually prepared the day before or the day after the lease was signed, "because we were working from the plans themselves in [with ?] which Mr. Slice was very familiar." He also testified that he believed that Mr. Slice executed the lease sitting at his (Mr. Holmes') desk "with the plans of this whole center lying before us at the time." Mr. Holmes admitted that he had drafted the lease. When pressed as to whether he had or had not attached a plot plan similar to Exhibit C to the lease before presenting it to Mr. Slice, he said that he didn't know—he would assume that he did, but he may not have. He did not know and he could not recollect. Mr. Slice, it will be recalled, denied that he had seen Exhibit C before signing the lease.

The Chancellor evidently accepted Mr. Holmes' testimony as to what plans were shown Mr. Slice, in preference to Mr. Slice's testimony on that matter. In his opinion he said that "the Court concludes from an overall consideration of the evidence, that the parties did negotiate upon the basis of a plat disclosing the location of Store #8 and the subdivision in which it was included, and that this lease * * * was the

outgrowth of that negotiation based upon the plat discussed by the lessee, Slice, and the real estate agent, Mr. Holmes * * *."

The Chancellor then went on to say:

"Now, we come to the question of what the parties intended, or what was the subject matter of the contract. The rule is that in considering the construction of a contract, the entire instrument must be considered and the language used given effect, if possible, and likewise the facts and circumstances surrounding the execution of the instrument.

"The Court concludes that the only property that was then in existence was the commercial development known as Hillcrest Heights Shopping Center, of which Store No. 8 was one; and that there was no contemplation at that time of any further or new development that would be adjacent to it.

* * *

"The Court's view is that this contract is specifically clear in describing what was the subject matter then in existence. And if Mr. Slice had desired to look ahead about some possible future development that might impinge upon his business, he could have done so.

* * *

"This is not a case of an ambiguity, as the Court sees it, which could be construed more strongly against the lessor, but rather a case where the Court is called upon to enlarge and to put into a contract some years later what was not put in it when it was executed, was not contemplated at that time, and enforce the contract as enlarged as against one of the contracting parties under quite different conditions and * * * circumstances.

* * *

"The Court concludes, therefore, that the Second Section of Hillcrest Heights Shopping Center was

a different and later piece of property which was not affected by the original lease to Slice, * * *."

Accepting the Chancellor's finding that the parties "did negotiate on the basis of a plat disclosing the location of Store No. 8 and the subdivision in which it was included,"[3] let us consider the effect of this finding. The subdivision is unquestionably Block M. The recorded plat of Block M shows the northeast corner of the intersection of Iverson Street and 23rd *Parkway*. It shows 23rd Place as stopping on the south side of Iverson Street. Paragraph 1 of the lease refers to Hillcrest Heights Shopping Center as located at the intersection of Iverson Street and 23rd *Parkway*. It is inconceivable that both parties to the appellant's lease did not know the location of the whole subdivision. Most assuredly, Carozza did and it was a matter of public record, made such by Carozza. Now, what is the function of a plat such as Exhibit C? We think that its purpose was to show the location and dimensions of the stores under construction and of the adjacent parking spaces to be made serviceable for use in connection therewith. It shows this area to be at the northwest corner of the intersection of Iverson Street and 23rd *Place* and shows the latter as extended beyond the point shown on the plat of Block M and as running along the east side of the shopping area. We do not think that its purpose or effect (assuming Exhibit C or a similar plat to have been the plat referred to in paragraph 1 of the lease) was to go further and to contract or contradict the meaning of the description of Hillcrest Heights Shopping Center as being at the intersection of Iverson Street and 23rd *Parkway* so as to confine the meaning of "Hillcrest Heights Shopping Center," as used in paragraph 7, to the original unit located at Iverson Street and 23rd *Place,* whether any extension or enlargement of the first unit was then in contemplation or not.

A construction which would so limit the area of the Shopping Center referred to in the appellant's lease seems strained.

---

3. Cf. *Rossi v. Douglas,* 203 Md. 190, 100 A. 2d 3, where a plat was not attached when an agreement was executed, but was later attached after approval by both parties.

It would ignore the obvious business fact that two adjacent portions of a shopping center built at different times on different portions of the same tract, owned and managed by the same owner, constitute a single shopping center. That only one unit may have been in contemplation when the first unit was built does not detract from that business fact. The very terms "Second Section Hillcrest Heights Shopping Center" or "Addition to Hillcrest Heights Shopping Center", at least one of which Carozza used in an effort to bolster up his contention of separateness, actually emphasize the fact of unity. The Chancellor seems to have felt that this economic, factual unity was not even at issue; but his construction of the appellant's lease absolutely nullified any practical effect of such unity.

At the core of the construction adopted by the trial court lies the finding that at the time of the execution of the appellant's lease, no further construction was contemplated. Mr. Holmes' testimony was the foundation for this finding. We think that even if this finding is correct, it would not be controlling. For that reason we refrain from passing upon the Chancellor's ruling excluding the evidence of Mr. Crozier to the contrary of Mr. Holmes' testimony which was offered on rebuttal. This, of course, does not imply our agreement with that ruling.

Both as a matter of the construction of words and as a matter of recognizing a plain economic fact, we are of the opinion that the covenant in paragraph 7 of the lease extends to the newly constructed addition to, or second part of, Hillcrest Heights Shopping Center. We need not go so far in the present case as to interpret the lease as covering *any* new shopping center which might be constructed on Block M, but surely it puts no strain upon the language to construe "Hillcrest Heights Shopping Center" as used in paragraph 7 as applying to a subsequent addition thereto situated in Block M, lying between the original twelve stores and 23rd Parkway and under common ownership and control with the twelve original stores. The description of the Shopping Center in paragraph 1 of the appellant's lease locates it as at the intersection of Iverson Street and 23rd Parkway. That

description plainly fits the Second Section or Addition. The reference to the theoretically attached plat serves, as we have said, to identify the location and size of the store and of the initial parking area. It does not serve to insulate that first built unit in any business sense from a subsequently constructed unit of what is in fact only one shopping center. If Gina's were not a restaurant, but a package liquor store fully competitive with Slice's, this practical business situation would be brought home even more forcefully. As the Chancellor pointed out, the parties to the appellant's lease were experienced business people. It would seem strange to suppose that they did not deal with each other and use business language in such a way as to accomplish an obvious and common sense business result.

As we turn to the authorities, we may note first that the theory of "objective law" of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake. *Ray v. Eurice,* 201 Md. 115, 93 A. 2d 272. "* * * where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective. * * * *Williston* * * * Sec. 94, page 294, says: 'It follows that the test of a true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.' " *Ray v. Eurice, supra,* p. 127.

The appellees' argument that the covenant should not be allowed to have effect with regard to a store that was not *in esse* or in contemplation at the time of execution of the lease is not sustainable. In *Shaft v. Carey,* 107 Wis. 273, 83 N. W. 288, the plaintiff leased from the defendants the saloon or barroom of the Palmer House, a hotel. The lease contained a stipulation that the plaintiff was to have the ex-

clusive right to sell liquors and cigars in the hotel. Defendants subsequently added to the hotel a structure known as the Palmer House Annex in which they opened a competing bar. It was contended that the restrictive covenant had no application to the Annex since it had been built after the lease had been signed and was not in existence at the time the agreement had been entered into by the parties. The lower Court held for the defendants and refused to issue an order restraining the defendants from using the Annex in competition with the plaintiffs. On appeal, the case was reversed; the appellate court found that when the Annex went into operation, it became a component part of the hotel, and thus came within the prohibition of the restrictive covenant. The court did not attach much importance to the fact that the new installation was operating under a slightly different name—an "Annex". Thus, in the present case, whether the lessors chose to call their adjacent new structures an "Addition" or a "Second Section" would seem to have little bearing on the important question of whether or not the expanded operation is for all practical purposes an integral part of a single shopping center.

In *Carter v. Adler,* 138 Cal. App. 2d 63, 291 P. 2d 111, the lessors contended that the exclusive rights granted to the lessee were restricted to the original shopping center and did not apply to a new parcel of adjacent land which was acquired after the date of the lease and used to increase and extend the facilities of the original shopping center. The court upheld the contention of the lessee, stating: "Concomitant with such a covenant is the implied obligation of the lessor not to cancel the covenant or derogate from its force by so using his adjoining property as substantially to impair the lessee's enjoyment of the leased premises." Since the addition to the shopping center was built on after-acquired property, the holding in the *Carter* case goes further than the appellant asks us to go in the present case.

In *Belvedere Hotel Co. v. Williams,* 137 Md. 665, 113 A. 335, where a hotel leased out the barber shop and manicuring concessions for a term of two years under a provision construed as giving the lessee the exclusive right to engage in

the barbering business in the hotel, the court held that provision was violated when the hotel subsequently leased to another party for use as a barber shop the front room on the first floor of an adjoining building connected with the hotel, where that room had not theretofore been used for such purpose. The fact that the subsequently leased room had a different street address than the hotel was not persuasive to the Court. See also *Schmidt v. Hershey,* 154 Md. 302, 140 A. 363.

In *Strates v. Keniry,* 231 Mass. 426, 121 N. E. 151, the defendant lessor covenanted with the plaintiff lessee that the lessor would not rent to any other lessee any part of the building in which the lessee's premises were located for any grocery, provision, meat or fish business "except the Cloverdale Store now located at No. 431 Park Avenue." After the lease had been in effect for a time, the Cloverdale Company left and a new tenant came in and occupied the space vacated by Cloverdale. The court decided that a proper construction of the covenant led to the conclusion that the new tenant could not use the premises in the conduct of a business competing with the plaintiff's, *i. e.,* that the exception in the covenant referred to a particular company, not to particular space or premises in the building. See also *Topol v. Smoleroff Development Corp.,* 264 App. Div. 164, 34 N. Y. S. 2d 653.

We accordingly hold that the exclusive covenant in the lease of a store in the first unit of the Shopping Center extends in operation to the additions to, or extensions of, the original area here involved.

We also hold that an exclusive covenant of this nature is violated by the lessor's submission to the forbidden use by another tenant, when this use is *contra* to the terms of the lease agreement between the lessor and the other tenant, and that such a covenant may be enforced by injunction proceedings against the original lessor and that the other lessee and, in this case, the individuals as well, are proper parties. *Snavely v. Berman,* 143 Md. 75, 121 A. 842. See also *R. M. Sedrose, Inc. v. Mazmanian,* 326 Mass. 578, 95 N. E. 2d 677, and *Topol v. Smoleroff Development Corp., supra.*

Appellees contend that appellant adduced no proof of competition by Gina's in the sale of alcoholic beverages for consumption off the premises, and therefore is not entitled to a reversal, even if he would otherwise be so entitled. It is a sufficient answer to this contention to say that such competition is admitted in the answer of all the appellees except Carozza Properties, Incorporated. The appellant himself testified that there was such competition and his photographic exhibit showing Gina's window demonstrates that Gina's had been advertising the "off sale" of beer and light wines. There was not one word of testimony by or on behalf of any of the appellees rebutting this allegation.

Gina's and the individual appellees also contend that they are not bound by anything contained in the appellant's lease because there is no proof of actual notice on their part and because the lease is defectively acknowledged and hence did not constitute constructive notice to them. Their contention as to actual notice is correct. As to constructive notice, both the execution and acknowledgment of the lease by Carozza are in full accord with the casualness and carelessness exemplified by the omission of the plat referred to in paragraph 1. However, the curative statute validating deeds and leases defectively executed or acknowledged (or both), Code (1951), Art. 21, Sec. 107, was repealed and reenacted between the date of actual record of the appellant's lease and the date of execution of Gina's lease.[4] The contentions based upon defective execution and acknowledgment of the lease therefore fall. *McDivit v. McDivit,* 148 Md. 271, 274, 129 A. 291.

Appellant has called to the attention of this Court four different rulings on evidence in which he asserts the Chancellor erred. The view we take of this case makes it unnecessary to state our views thereon.

The decree will be reversed and the case remanded for the issuance of an injunction against the violation of the exclusive covenant contained in paragraph 7 of the appellant's lease,

4. Acts of 1953, Ch. 61; also Acts of 1954, Ch. 47.

and for the determination of such damages as the appellant may be entitled to for breach of that covenant.

*Decree reversed and case remanded for the issuance of an injunction and the determination of damages in accordance with the opinion herein; with costs to the appellant, to be paid one-half by Carozza Properties, Inc., and one-half by the other appellees.*