**Louise SAGALYN, Arnold Sagalyn, Appellants,**

v.

**FOUNDATION FOR PRESERVATION OF HISTORIC GEORGETOWN, Appellee.**

Nos. 94–CV–1024, 94–CV–284.

District of Columbia Court of Appeals.

Argued Feb. 13, 1996.
Decided March 20, 1997.

Whayne S. Quin, with whom J. Carter McKaig, Washington, DC, was on the brief, for appellants.

Richard B. Nettler, Washington, DC, for appellee.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

WAGNER, Chief Judge:

In these consolidated appeals, appellants, Louise and Arnold Sagalyn, challenge five trial court orders granting appellee, the Foundation for the Preservation of Historic Georgetown (Foundation), injunctive and declaratory relief and awarding appellee attorneys' fees.[1] They argue that the trial court erred in holding that by consolidating their record lots into one new record lot without a change in boundaries, they violated the terms of an Easement which prohibited the subdivision of their real property. They contend that the trial court erroneously based its decision on an interpretation of "subdivide" to include an assemblage of lots, which is contrary to its plain meaning and the intent of the parties, and which, in any event, did not occur here. The Sagalyns challenge the

---

1. The Sagalyns do not challenge the trial court's order granting an injunction against their construction of an addition to their residence, except to the extent that it forms a basis for the award of attorneys' fees.

award of attorneys' fees on the grounds that the conditions for their recovery, as set forth in the Easement, were not met and that the amount awarded is excessive. We hold that the trial court properly determined that the Sagalyns subdivided their lot within the meaning of their Easement. However, we reverse the order awarding attorneys' fees and remand to the trial court for further consideration consistent with this opinion.

## I.

At the center of this controversy is a Deed of Scenic, Open Space, and Architectural Facade Easement (the Easement) which the Sagalyns' predecessors in title, W. Randolph Burgess and Helen Burgess (grantors), donated to the Foundation (grantee) in December 1977 on the Burgesses' property at 1248 30th Street, N.W., Washington D.C., in historic Georgetown. For assessment and tax purposes, the property was designated as Lot 892, Square 1209, although the property was comprised of parts of record lots 10, 11, 12 and 13 and part of lot 1 in Square 39. The Easement imposed several restrictions on the alteration, use, division and conveyance of the property, among them a prohibition against subdivision or conveyance except as a unit.[2] The Easement also provides that

in the event of violation of its covenants or restrictions, the grantee can institute a suit for injunctive relief and recover costs and attorneys' fees if it prevails. The grantors and the Foundation obtained an appraisal of the value of the Easement in order to determine the value of the income tax deduction available as a result of the transfer. According to the appraisal report, under the then-current zoning regulations, the highest and best use for the property would be its division into four single family lots. According to the appraisal, the prohibition against subdivision diminished the value of the property by $50,000.

The Sagalyns purchased the property from the Burgesses in November 1985. Prior to the purchase, the Foundation granted them permission to construct a swimming pool on the property. The Sagalyns sought another waiver of the Easement to construct a one-story addition to their kitchen, but the Foundation denied the request on March 30, 1989 as well as subsequent requests for meetings and for reconsideration in April and May of 1989. Without the Foundation's knowledge, the Sagalyns applied for and obtained a new record lot designation for the property, Lot 52, in July 1989 as a preliminary step toward

---

2. Pertinent to this case, the Easement provided, as follows:

(1) ... Without the express written permission of the Grantee ... no construction, alteration, or remodeling or any other thing shall be undertaken ... on the subject premises ... which would affect either the exterior surfaces ... or increase the height, or alter the exterior facade (including, without limitation, the exterior walls of garden and of residence, the roofs, cupola and chimneys) or the appearance of the building located thereon ...; provided, however, that the reconstruction, repair, repainting or refinishing of presently existing parts or elements of the lot and improvements ... damage to which has resulted from casualty loss, deterioration, or wear and tear, shall be permitted....

(2) The property shall be used only for residential purposes, but not for a boarding house, rooming house, or dormitory, and no industrial or commercial activities shall be carried on on the property.

(3) The property shall not be subdivided, nor shall it ever be devised or conveyed except as a unit[.]

(4) No extension of the existing structure or erection of any additional structures shall be permitted, except that in the event of damage resulting from casualty loss to an extent rendering repair or reconstruction of the existing improvements impracticable, erection of a new single-family residential structure shall be permitted.

*    *    *    *    *    *

(7) No topographical changes, including but not limited to excavation and the cutting of trees ... shall occur upon the property.

*    *    *    *    *    *

(9) In the event of a violation of any covenant or restriction herein, the Grantee ... may, following reasonable notice to Grantors, institute a suit to enjoin by ex parte, temporary, and/or permanent injunction, such violation and to require the restoration of the premises to their prior condition.... The Grantee ... shall also have available all legal and equitable remedies to enforce Grantors' obligations hereunder, and in the event Grantors are found to have violated any of their obligations Grantors shall reimburse the Grantee ... for any costs or expenses incurred in connection therewith, including court costs and attorneys fees.

securing a building permit for the kitchen addition.[3] This designation effected no changes to the boundary or square footage of the property. On August 17, 1989, the Sagalyns filed a building permit application with the District of Columbia Department of Consumer and Regulatory Affairs (DCRA). The DCRA referred the application to the Commission of Fine Arts (Commission).

The Commission held a hearing on the application on June 21, 1990, and the Foundation appeared in opposition to it. The Commission forwarded its recommendation to the designated Mayor's agent, who adopted the recommendation pursuant to D.C.Code § 5–1005 (1992), finding that a building permit could be issued.[4] The District issued a building permit to the Sagalyns on August 2, 1990.

During August 1990, counsel for the parties exchanged correspondence. The Sagalyns agreed not to commence construction on the addition, and the Foundation agreed to refrain from taking legal action. According to the Sagalyns, they instructed their counsel to inform the Foundation that they would not pursue construction without approval of plans acceptable to the Foundation. At the same time, the Sagalyns took the position that they had not sought division of the property; therefore, they had not violated the Easement. On September 4, 1990, counsel for the Foundation wrote the Sagalyns' attorney and explained that he had met with the Sagalyns' architect and received their offer of settlement; however, many of the Foundation's trustees were out of town, therefore he could not respond. He indicated that he had to file the petition for review of the administrative order and a complaint to protect the Foundation's rights "[i]n light of the Foundations's concerns about the building permit ... and the Corporation Counsel's position with regard to the timeliness of the challenges to the administrative orders."

On September 4, 1990, the Foundation filed a complaint in Superior Court for declaratory and injunctive relief to enforce the Easement. On May 23, 1991, the Foundation agreed to allow the Sagalyns to replace their existing kitchen wall with a glass wall, but made as a precondition the payment of attorneys' fees up to the date of settlement.[5] Attorneys' fees amounted to $11,013.70 as of May 29, 1991. On June 20, 1991, the Sagalyns accepted the settlement as to the construction, but refused to pay attorneys' fees, contending they had not violated the Easement. On December 12, 1991, the trial court (Judge Ricardo Urbina) granted partial summary judgment for declaratory and injunctive relief and enjoined the Sagalyns from constructing any addition without the Foundation's approval or leave of court. The court referred the Foundation's request for attorneys' fees to a mediator and held in abeyance the issue of whether an assemblage of lots constitutes a subdivision within the meaning of the Easement pending attempts by the parties to settle. When the parties failed to settle, final summary judgment was entered in favor of the Foundation on December 1, 1993. In that order, the trial court concluded that the terms "subdivided," "subdivide" and "subdivision" are terms of art which control the use of the terms in the Easement and that the Sagalyns violated the Easement by assembling the property into a single lot of record. The trial court denied the Sagalyns' motion for reconsideration, and

3. A building permit will not be issued for an addition to a structure covering two or more lots unless a fire wall separates them. The addition contemplated was to be a part of the main structure; therefore, the Sagalyns had to obtain a single record lot designation in order to proceed. *See* 11 DCMR § 3202.3 (1996).

4. The Commission found that:
    [T]he proposed addition: (1) would have minimal effect on a recently constructed (1961) wing of an existing building; (2) is barely, if at all, visible from public space; (3) its design is appropriate to the existing building and will be an improvement over present conditions, and; (4) complies with the intent and specific requirements of Public Law 808, *The Old Georgetown Act.*

5. Approval was granted provided that (1) the glass wall did not encroach upon any existing open space (*i.e.,* is not a bay); (2) the existing permit for the addition was returned to the District; and (3) the Foundation would have an opportunity to review any final architectural designs.

later granted the Foundation's motion for attorneys' fees.

The parties agreed that the issue could be resolved by summary judgment. In its memorandum opinion and order determining whether the Sagalyns had violated the Easement by subdividing the property, the trial court (Judge Arthur Burnett) concluded that the term "subdivide" was used in real estate at the time that the Easement was prepared to include a division or assembly of land. The court relied upon subdivision regulations which defined "subdivision" as "the division or assembly of land into one or more lots of record." 10 DCMR § 2799.3 (1994). The court also had before it an affidavit of H.C. Langelan, a private surveyor, providing a definition to the same effect. It was the court's view that any attorney preparing the Easement would have known and had reference to this definition. The trial court held that:

> The fact that the "assembly" here did not result in the addition of any additional land area is beside the point; the act of applying for a plat of subdivision, merging the portions into a new Lot of Record for purposes of the Office of Surveyor records nonetheless violated the "subdivision" prohibition of the Deed of Easement in this case.

## II.

■ The Sagalyns argue that the trial court erred in concluding that they had violated the Easement by having their lots redesignated as a single lot. They contend that the trial court erred in concluding that "subdivide" is a term of art that includes an assembly of lots and that, in any event, no "assembly" of lots occurred. They claim that the plain meaning of the Easement should govern. Absent a violation of the Easement, they argue, attorneys' fees are not recoverable under the terms of the Easement.

### A. *The Disputed Clause*

At issue here is the meaning of "subdivide" as used in paragraph (3) of the Easement. That provision reads, "[t]he property shall not be subdivided, nor shall it ever be devised or conveyed except as a unit." As they

did in the trial court, the Sagalyns argue that the language must be given its plain, ordinary and usual interpretation. They argue that the plain and ordinary meaning of "subdivide," according to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, is to divide into building lots. They cite BLACK'S LAW DICTIONARY (6th ed.1990) which states that "subdivide" means to divide a part into smaller parts and that "subdivision" means a division of a lot, tract or parcel or land into two or more lots, tracts, parcels or other divisions of land for sale or development. Thus, they contend that consolidating their record lots into a single lot designation with no change of boundaries is not a subdivision within the meaning of the Easement's terms.

■ In this jurisdiction, we adhere to an "objective law" of contracts, which means that the written language will govern the parties' rights, unless it is not susceptible of clear meaning or absent other circumstances not pertinent here. *See Minmar Builders, Inc. v. Beltway Excavators, Inc.,* 246 A.2d 784, 786 (D.C.1968) (quoting *Slice v. Carozza Properties,* 215 Md. 357, 137 A.2d 687, 693 (1958)).[W]ords [are] given their ordinary and usual meaning. *National Symphony Orchestra Ass'n v. Konevsky,* 44 A.2d 694, 695 (D.C.1945). As has often been stated, "[t]he first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty Const. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982) (citing *District of Columbia Dep't of Hous. and Community Dev. v. Pitts,* 370 A.2d 1377, 1380 (D.C.1977) and *1901 Wyoming Ave. Coop. Ass'n v. Lee,* 345 A.2d 456, 461 (D.C.1975)). "The presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the [agreement]." *Lee,* 345 A.2d at 461–62 (footnote omitted); *Intercounty,* 443 A.2d at 32. "[T]he reasonable person is bound by all usages which either party knows or has reason to know." *Intercounty,* 443 A.2d at 32; *Lee,* 345 A.2d at 462.

■ Contrary to the Sagalyns' position, the Foundation argues that there is no "plain" meaning for the term "subdivide" as

used in the Easement. It contends, consistent with the trial court's ruling, that "subdivide" as used here is a "term of art, with a definite and express meaning, depending on the jurisdiction in which it is being used." We agree that the context in which the word is used may shape the term's meaning. We have recognized that the term may have different meanings depending on the context in which it is used. *See, e.g., Acheson v. Sheaffer,* 520 A.2d 318, 319–20 (D.C.1987). In *Acheson,* the issue was "whether the division of several property lots and their subsequent combination into two lots of record constitutes a subdivision within the meaning of the Historic Landmark and Historic District Protection Act, D.C.Code §§ 5–1001 *et seq.* (1981)[Act]." 520 A.2d at 319 (footnote omitted). At the time, the Act defined subdivision as the "division of a lot into 2 or more lots of record,"[6] while the Subdivision Regulations, Art. I, § 2(j) (1967), also included assembly of lots within its definition.[7] *Id.* There, we held that the action of the Surveyor in aggregating the parts of the four lots into two of record did not fall within the Act's definition. *Id.* at 320. Thus, it is apparent that the term "subdivide" is susceptible to other meanings beyond its dictionary definition which the Sagalyns advance, and may be informed by the context in which the word is used. Where, as here, the disputed term is reasonably susceptible of different interpretations, the provision is considered to be ambiguous. *Lee, supra,* 345 A.2d at 461 n. 7. In interpreting the term, we look to the rules

of contract construction.[8] *See Intercounty, supra,* 443 A.2d at 32.

In this case, the trial court found that "subdivide" must be given the same meaning as found in the District of Columbia Planning and Development regulation which defines "subdivision" as "the division or assembly of land into one or more lots of record." 10 DCMR § 2799.3. Here, the Sagalyns filed a plat with the Office of the Surveyor to assemble the lots into one record lot as a prerequisite to obtaining a building permit. Under the definition provided in § 2799.3, this constituted an "assembly of land into one ... lot[ ] of record." *Id.* As the trial court determined, it is reasonable to conclude that the parties knew or should have known the meaning of "subdivide" in real estate at the time the Easement was created. Since the parties are "bound by [the] usages [of a term] which either party knows or has reason to know," *Intercounty, supra,* 443 A.2d at 32, it cannot be said that the trial court erred in interpreting "subdivided" according to the definition set forth in the real estate regulations. The trial court's interpretation of the term is supported by the affidavit of a private surveyor, Langelan, who stated that "[c]ommon usage of the term 'subdivision' in the District of Columbia includes both the division of lots and the assembly of lots or parts thereof into one or more other lots." The Sagalyns offered no counter-affidavits refuting the claim.[9]

6. The Council subsequently amended the law to provide that the assemblage of land constitutes a subdivision under the Act. *See* D.C. Law 8–232, 38 D.C.Reg. (1991).

7. "A 'lot' is a general term used to describe any plot, parcel or piece of land. A 'lot of record' is a lot platted and recorded by the District of Columbia Surveyor." *Acheson, supra,* 520 A.2d at 319 n. 1 (citing 11 DCMR § 199.4, 199.9 (1986) and 14 D.C.Reg. 39 (1967)).

8. The endeavor to ascertain what a reasonable person in the position of the parties would have thought the words of a contract meant applies whether the language is ambiguous or not. *1010 Potomac Assoc. v. Grocery Mfr. of Am.,* 485 A.2d 199, 205–06 (1984); *Lee, supra,* 345 A.2d at 461 n. 9. In determining what a reasonable person in the position of the parties intended, we consider that the reasonable person is: (1) presumed to know the circumstances surrounding the making

of the contract; and (2) bound by the usages of the term which either party knows or has reason to know and the course of conduct of the parties. *Intercounty, supra,* 443 A.2d at 32. We also consider the intent of the parties in entering into the agreement. *Id.* Where the document is unambiguous, its language provides "the best objective manifestation of the parties' intent." *1010 Potomac,* 485 A.2d at 205 (citations omitted). "Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous." *Id.* (citation omitted). If ambiguities remain, then the contract is construed against the drafter. *Intercounty,* 443 A.2d at 32.

9. The Sagalyns' argument that the appraiser's report, which the trial court considered in determining the usage of the term subdivide, was irrelevant in resolving the ambiguity is correct. This court has decided previously that a contemporaneous appraiser's report, introduced under

## B. *Consistency Argument*

The Sagalyns contend that the trial court's definition of "subdivided" is erroneous because it fails to give meaning to every part of the Easement, thereby creating internal inconsistencies in the document and prohibiting action which otherwise would be permissible. Specifically, they claim that they would have to consolidate the property into one record lot to meet the requirements of 11 DCMR § 3202.3 as a prerequisite for obtaining a building permit which would allow them to take the following actions permitted by the Easement: (1) reconstruct the home in the event of damage; (2) convert the home to other residential uses; and (3) erect a single family dwelling in the event of total casualty loss.[10] The Foundation responds that § 3202.3 has never been construed to prohibit the reconstruction of a home or its conversion to other residential use. It points out that a modification would be necessary for these actions, but that a destruction of the dwelling because of casualty "would change fundamentally the nature of the Conservation Easement." In such a case, the Foundation concedes that "[b]y necessity, a modification of the [Easement] may have to be drafted which would permit the [p]roperty to be subdivided," since the subject of the restrictions in the Easement would no longer exist.[11] It is clear that the Easement explicitly permits the Sagalyns to reconstruct, rebuild and change the use of the principal dwelling on the property under specified circumstances, but that they may not subdivide the property. There is no actual inconsistency between these provisions of the document. What creates the problem, according to the Sagalyns, is a local regulation. While these factors may bear upon potential issues as to the enforcement of the provisions for reconstruction and rebuilding, they do not guide the interpretation of the provision under consideration here. Therefore, we are not persuaded that there exists an internal inconsistency in the document which precludes interpretation of the term "subdivide" as interpreted by the trial court.

## C. *The Intent of the Parties*

The Sagalyns argue that the parties could not have intended to prohibit the mere obtaining of a single record lot in place of a single assessment taxation lot. The intention of the parties to the Easement, they contend, was to protect the integrity of the exterior and open spaces of the property. They argue that if the parties had intended to prohibit the renumbering of the record lots into one single record lot, the Easement would have included such a restriction specifically. They contend that the plain ordinary meaning of the term "subdivided" conveyed the parties' purpose, *i.e.*, that the property would not be changed in dimension or boundary.

This argument essentially restates the argument concerning the meaning of the term "subdivide" previously addressed. With certain limited exceptions, not present here, " '[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the [agreement].' " *Minmar, supra,* 246 A.2d at 786 (quoting *Slice, supra,* 137 A.2d at 693).

The Sagalyns contend that the shift from an assessment and taxation lot to a record lot without any change in dimensions of the property furnishes no additional rights in

circumstances similar to those in this case, as extrinsic evidence of the parties' intended meaning of a term, is not competent or "sufficient evidence" of the definition intended by the parties. *Foundation for Preservation of Historic Georgetown v. Arnold,* 651 A.2d 794, 797 (D.C. 1994) (citations and internal quotation marks omitted). However, this point does not alter the result in light of the other grounds for the trial court's decision.

10. Section 3202.3 provides in pertinent part that a building permit shall not be issued for the proposed erection, construction, or conversion of any principal structure, or for any addition to any principal structure, unless the land ... has been divided so that each structure will be on a separate lot of record.

11. The Foundation asserts that it has granted such a modification to another property by adding language "to allow limited construction and a subdivision." The modification provided that "[c]onsolidation of the property into a single assessment and taxation lot for tax purposes shall be permitted with 60 days notice to the Grantee."

general nor does it convey or imply any additional rights under the Easement. As the trial court observed, however, whether the boundaries of the property were changed is not determinative of the issue. What is at issue here is whether the Sagalyns violated the Easement by obtaining a single record lot. However, as the Foundation points out, the shift from an assessment and taxation lot number to a record lot number, *does* alter the rights of the parties in that the record lot designation permits the Sagalyns to obtain a building permit, thereby placing them in a position to violate the restrictions in the Easement.[12]

### D. *Ambiguities Construed Against the Drafter*

The Sagalyns make an argument for construing any ambiguity against the drafter, the Foundation. *See Arnold, supra* note 9, 651 A.2d at 797. ("[A] deed will be resolved against the drafter of the instrument."). They recognize, however, that "[this] principle applies only after the ordinary rules of construction have been applied and the agreement is still ambiguous." *See Lee, supra,* 345 A.2d at 463 (citing 17 Am.Jur.2d *Contracts* § 276 (1964)); *Intercounty, supra,* 443 A.2d at 32. Here, the ambiguity is resolved by reference to other rules of construction as previously discussed. Therefore, we need not apply this rule.

### E. *Absence of an Assemblage*

The Sagalyns also press the argument that if "subdivided" is a term of art, an "assembly" is also and that no assemblage took place because they merely took one assessment and taxation lot and replaced it with one record lot. This argument also fails. Contrary to the Sagalyns' assertion, this case is similar to *Acheson,* where this court found that an assembly, but not a division, had occurred where three lots were added together to form one new record lot, and a second lot was created by adding all four lots. *Acheson, supra,* 520 A.2d at 320. The Sagalyns contend that *Acheson* cannot be compared because a subdivision occurred,

where four lots, two of record and two others, were combined and replaced by two new lots. *Id.* at 319. This argument was rejected in *Acheson.* There, this court stated that it was the end product, *i.e.,* the aggregation of two or more lots, with which the legislature was concerned. *Id.* at 320.

### III. *Attorney Fees*

■ The trial court awarded the Foundation $33,994.65 in legal fees. The Foundation is entitled to recover such fees only as provided under paragraph 9 of the Easement. That paragraph provides for an award of attorneys' fees and costs in the event the grantors or their successors (the Sagalyns) violate covenants or restrictions in the Easement and the grantee (the Foundation) institutes suit to enjoin the violation or to enforce other remedies.

The Sagalyns argue that the requirements for the recovery of costs and attorneys' fees were not met in this case. They contend that neither the procurement of a building permit nor a record lot designation violated the terms of the Easement. Moreover, they contend that the Foundation did not institute an action to enjoin any violation or enforce any obligation.

While the redesignation of the lot technically violated the terms of the Easement, as previously determined, the Sagalyns have not been shown to have violated any other provisions of the Easement. Even the Sagalyns' procurement of a building permit is not prohibited by the terms of the Easement. What is restricted is any alteration or construction of the exterior surfaces of the building. The Sagalyns did not alter the premises in any way or even commence actual physical preparations for construction on the premises. Indeed, there is evidence in the record that they agreed not to undertake any construction without the Foundation's consent. The Foundation does not dispute this contention or the further contention that they had agreed to withhold suit pending further discussions. Therefore, it appears that the Foundation's efforts to enjoin construction of

---

12. The Sagalyns candidly admit that they sought the single record lot designation in order to get the building permit. They claim they wanted to

secure a review by the Commission in order to pressure the Foundation to reconsider its opposition to the addition.

an addition to the Sagalyns' property were premature.

However, litigation over whether the Sagalyns had violated the prohibition against subdividing is legitimate, even if that violation is not imminently harmful without further action. The Sagalyns assert that any award of attorneys' fees should be limited to those paid in connection with the litigation over the meaning of the word "subdivide," and not work undertaken to enjoin the addition, which it agreed not to undertake without the Foundation's consent. Their argument has merit. It appears that the trial court, which was not the court which decided the case on the merits, did not give consideration to the substantial legal services performed on the Foundation's behalf that were not occasioned by any violation of the Easement. Given what was legitimately at issue and covered by paragraph 9 of the Easement, the attorneys' fees awarded are unreasonable. The determination of reasonableness of attorney's fee lies within the trial court's sound discretion. *Hampton Courts v. District of Columbia Rental Hous. Comm'n,* 599 A.2d 1113, 1115 (D.C.1991). However, the failure to take into account the extent to which the services were unnecessary, specifically those not associated with the subdivision issue, results in an abuse of discretion and an excessive award. *See Johnson v. United States,* 398 A.2d 354, 364–66 (D.C.1979). Therefore, we must remand the case to the trial court for redetermination of an award taking into account this factor.

For the foregoing reasons, the judgment appealed from hereby is affirmed, in part, and the issue of attorneys' fees is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*