**CAPITAL CITY MORTGAGE CORPORATION, Appellant,**

v.

**HABANA VILLAGE ART & FOLKLORE, INC., Appellee.**

No. 98–CV–308.

District of Columbia Court of Appeals.

Argued Jan. 27, 2000.
Decided March 23, 2000.

---

Eric J. Sanne, Chevy Chase, MD, for appellant.

Larry Gordon, Washington, DC, for appellee.

Before SCHWELB and WASHINGTON, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This appeal arises from a dispute between appellant, Capital City Mortgage Corporation (landlord), and appellee, Habana Village Art & Folklore, Inc. (tenant), regarding the parties' respective responsibilities under a commercial lease when the heating and cooling units ceased to function, they could not be repaired, and the tenant demanded their replacement by the landlord—who refused—during the lease term. After a bench trial, the court concluded that the lease was ambiguous and thus admitted extrinsic evidence to determine whether the landlord or the tenant

was responsible for the replacement of non-reparable heating and cooling units within the leased premises. On the basis of that evidence, the trial court ruled for the tenant. We conclude, to the contrary, that the lease agreement was not ambiguous. Its plain language allocates the contested responsibility to the tenant—contingent on the tenant's election to replace the units; no question of a mandatory duty to replace the units during the lease term, or at its end, is presented. The trial court accordingly erred in admitting the extrinsic evidence that suggested a different result. Hence, we reverse the judgment and remand for further proceedings.

## I.

On December 22, 1995, landlord and tenant entered into a lease of commercial property at 1834 Columbia Road, N.W., for operation of a restaurant and night club. Among other things, the lease provided:

¶ 18. That [the Tenant] will, at his risk, cost and expense, during the term of this agreement or any renewal or extension thereof, make all repairs or improvements to said premises as same become necessary or are required, except repairs to the roof not caused by the negligence of the Tenant, which Landlord will make when necessary and upon notice.

There was an additional, typed provision at the end:

The property is to be leased in "as is" condition except that the lessor is to repair the fire escape and roof. The lessee is to perform all minor and major maintenance.

The lease also contained the following two clauses:

¶ 25. The lessee agrees that no representations other than that (sic) contained herein have been made.

**It is further understood and agreed,** that this instrument contains the entire agreement between the parties hereto and shall not be modified in any manner except by an instrument in writing executed by the parties hereto . . . .

## II.

A dispute arose between landlord and tenant regarding responsibility for replacement of the heating and cooling units, which had failed and (both parties agree) could not be repaired. The tenant withheld rent because of the landlord's refusal to replace the defective units. The landlord accordingly filed a complaint for possession of the premises in the Landlord Tenant Branch, and the case went to trial on January 28, 1998. The court sustained the complaint and awarded the landlord $11,000 for unpaid rent. The court further ruled, however, that the landlord had retained responsibility for replacing the heating and cooling units.[1]

1. In granting possession and back rent to the landlord while ruling that the landlord, not the tenant, was responsible for replacing the malfunctioning heating and cooling units, the court ruled that these issues were wholly independent of each other, based on independent covenants under the lease. According to the court's analysis, therefore, the tenant could not defend against the landlord's action for possession and back rent by claiming the landlord's default on an alleged obligation under the lease to maintain the heating and cooling units in good working order (by analogy, for example, to alleging housing code violations, which can serve as defenses to actions for possession and nonpayment of rent. See, e.g., McNeal v. Habib, 346 A.2d 508, 511 n. 6 (1975) (citing Edwards v. Habib,

130 U.S.App. D.C. 126, 138–40, 397 F.2d 687, 699–701 (1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969))). We are not asked to address the trial court's "independent covenants" ruling.

Nor are we asked to consider—and thus we do not consider—whether there could be any difference between the responsibility for replacing defective heating and cooling units during the term of the lease, while the tenant is in possession, and any obligation the tenant may have to restore the premises upon expiration of the lease pursuant to paragraph 7, which requires the tenant to "keep said premises in good order and condition, and surrender same at the expiration of the term herein in the same order in which they are received, usual wear and tear and damage by fire,

The tenant had argued at trial, and the court agreed, that the lease was ambiguous as to the parties' respective responsibilities for the premises. According to the trial judge, neither paragraph 18 of the lease (quoted above), a pre-printed clause in the standard lease agreement, nor the additional provision typed at the end of the lease (also quoted above), covered the replacement of heating and cooling units. More specifically, the court focused on the typed provision requiring the "lessee ... to perform all minor and major maintenance." Finding the provision ambiguous, the court took testimony to help with interpreting it. Based on evidence of a conversation about the heating and cooling units that occurred before the lease was signed, the court construed the lease against the landlord, ruling that the tenant had asked for the typed provision specifically for the purpose of limiting its liability to "maintenance," not "replacement." According to the judge, the typed provision "says something different than saying you're going to do capital improvements and you're going to replace a major system like the heating and air conditioning if it goes out while you're the tenant."

### III.

■■■ We examine, first, the applicable law. Leases of real property are to be construed as contracts. *Hart v. Vermont Inv. Ltd. Partnership*, 667 A.2d 578, 582 (D.C.1995); *Management Partnership, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C. 1980). In this jurisdiction, we "adhere to the 'objective law' of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, ... unless the

written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake." *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C.1968) (*quoting Slice v. Carozza Properties*, 215 Md. 357, 137 A.2d 687, 693 (1958)); *accord Adler v. Abramson*, 728 A.2d 86, 88 (D.C. 1999); *Sagalyn v. Foundation for Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C.1997).

■■■ In order to determine whether a contract provision has more than one reasonable interpretation, it is necessary to look at the "face of the language itself, giving that language its plain meaning, without reference to any rules of construction." *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990) (*quoting Kass v. William Norwitz Co.*, 509 F.Supp. 618, 625 (D.D.C. 1980)); *Sagalyn*, 691 A.2d at 111 (stating that words are "given their ordinary and usual meaning"). If the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, *American Bldg. Maintenance Co. v. L'Enfant Plaza Properties, Inc.*, 655 A.2d 858, 861 (D.C.1995), then the court—after admitting probative extrinsic evidence—must "determin[e] what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 33 (D.C.1982).[2] Only if, after applying the rules of contract interpretation, the terms still are not subject to "one definite meaning," *1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 463 (D.C.1975), will the ambiguities be "construed strongly against the drafter." *Id.* at 462. Unless extrinsic evidence is admissible, the determination as to ambi-

storm and public enemies only excepted." We note, however, that there is no allegation that suggests the units malfunctioned and became non-reparable because of someone's fault, rather than because of usual wear and tear or acts beyond any party's control.

2. Extrinsic evidence may include "the circumstances before and contemporaneous with the making of the contract, all usages—

habitual and customary practices—which either party knows or has reason to know, the circumstances surrounding the transaction and the course of conduct of the parties under the contract." *1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 461–62 (D.C.1975); *accord Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C.1990).

guity of a contract is purely a question of law, which this court reviews de novo. *Hart,* 667 A.2d at 582; *Sacks,* 569 A.2d at 154; *Burns v. Hanover Ins. Co.,* 454 A.2d 325, 328 (D.C.1982).[3]

Applying the foregoing principles, we conclude that the trial court erred in admitting extrinsic evidence, because none of the provisions at issue is ambiguous. *See Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1092 (D.C.1988) (*quoting Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983)) (stating that, in absence of ambiguity, "a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence").

In the first place, according to plain language (quoted above) in paragraph 25 and in the integration clause that follows it—which are wholly consistent with, and reinforce, one another—"no representations" outside the contract language "have been made," and the written lease contains "the entire agreement between the parties." Accordingly, since there are no allegations of "fraud, duress, or mutual mistake"[4] that would justify admission of extrinsic evidence despite clear contract language, *Minmar Builders, Inc.,* 246 A.2d at 786, no extrinsic evidence may be elicited to prove additional terms of agreement. *See Ozerol v. Howard Univ.,* 545 A.2d 638, 642 (D.C.1988). We focus, therefore, exclusively on the lease as written.

The question is: whether the lease terms themselves are ambiguous and thus require interpretation by reference to extrinsic evidence. As we shall see, there is no ambiguity. First, according to paragraph 18 of the lease, the tenant will "make all *repairs* or *improvements* ... except repairs to the roof not caused by the negligence of the Tenant" (emphasis added). Next, according to the typed addition, the property is to be leased "as is" except that (1) "the lessor is to repair the *fire escape* and roof" (emphasis added)—an augmentation of paragraph 18 not relevant here—and (2) "[t]he lessee is to perform all minor and major *maintenance*" (emphasis added). Given the lease's plain language, i.e., its "ordinary and usual meaning," *Sagalyn,* 691 A.2d at 111, we conclude that replacement of—meaning a substitution for—the defective heating and cooling units does not amount to a "repair"[5] or an "improvement"[6] under paragraph 18. The parties agree that the existing units themselves could not be "restore[d] to a sound or good state." *Supra* note 5. New equipment was required. Such replacement, therefore, would not be a mere "repair." *Supra* note 5. Moreover, the leased premises already had received, at the lease's inception, the "valuable addition," *supra* note 6, of heating and air conditioning. Replacement of an existing improvement, therefore, would not in itself be a further "improvement" (unless, perhaps, the equipment was upgraded, an issue not

---

**3.** In contrast, "interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *1901 Wyoming Ave. Coop. Ass'n,* 345 A.2d at 461 n. 8 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 212(2) (1981)).

**4.** We have said that "[m]utual mistake ... generally refers to both parties believing an extrinsic fact to be true which in fact is erroneous." *Isaac v. The First Nat'l Bank of Maryland, D.C.,* 647 A.2d 1159, 1162 (D.C.1994) (citing among other sources E. ALLAN FARNSWORTH, 2 FARNSWORTH ON CONTRACTS § 9.3, at 508 (1990)) (stating that "mutual mistake occurs

when both parties are under substantially the same erroneous belief as to the facts"). The tenant has not alleged such "mutual mistake" here.

**5.** According to WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION, "repair" means "to restore to a sound or good state after decay, injury, dilapidation, or partial destruction; as, to repair a house, a road, etc."

**6.** According to WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION, "improvement" means "a valuable addition, or betterment, as a building, clearing, drain, fence, etc., on land."

presented here). *Supra* note 6. Nor, finally, is replacement of the heating and cooling units a matter of "maintenance" [7] under the typed addition. That language implies, at most, a "repair" (paragraph 18) but more likely, in order to avoid redundancy, means no more than custodial "upkeep." *Supra* note 7. In sum, we believe that no reasonable person could construe "repairs," "improvements" or "maintenance," as used in the lease—and discussed above—in any other meaningful ways. *See Intercounty Constr. Corp.*, 443 A.2d at 32. If, therefore, these phrases were the only ones involved, we would agree with the trial court, even without regard to extrinsic evidence, that the tenant's specified responsibilities would not extend to replacement of the needed units.

So what pertinent language is left? On whom does the lease impose this "replacement" responsibility during the term of the lease when the tenant insists on replacement? The word "replacement" is not used, but there is other, controlling language. Except for the specified obligations of the landlord ("fire escape" and "roof"), and, more fundamentally, in addition to the responsibilities specified for the tenant ("repairs," "improvements," and "maintenance"), the tenant takes the property under the lease—in the words of the typed addition—"as is." Accordingly, if the heating and cooling units (i.e., lease "improvements") need replacement, not merely "repair" or "maintenance," during the lease term, such replacement plainly is up to the tenant holding the property "as is."

The tenant asks us to rule, nonetheless, that the tenant's affirmative obligation to provide "all minor and major maintenance," as well as to make "all repairs or improvements" (with exceptions), creates a negative implication that the tenant has no other, more burdensome obligation to keep the improved property in working order.

But that cannot be true. The language of the lease affirmatively obligating the tenant to provide "repairs," "improvements," and "maintenance" does not undermine or dilute, let alone eradicate, the fundamental provision that defines the very nature of the lease—i.e., that expressly says the tenant takes the property "as is." That overall, "as is" provision binding the tenant, not the collection of narrower tenant obligations, specifies the tenant's responsibility—the tenant's minimum as well as its maximum burden—for keeping heating and cooling units in place and in working order during the term of the lease. Otherwise, the words "as is" would have no discernible meaning.

■ The court construing a contract cannot ignore a contract term; each provision must be given meaning if at all possible. *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205–206 (D.C.1984). Under the lease here, the tenant's express obligations for "improvements," "repairs," and "maintenance" of the property—all distinct concepts, see *supra* notes 5, 6, and 7—are consistent with, and reinforce, the meaning of "as is." They in no way serve in opposition to it. The lease would be garbled, indeed impossible to construe, if we were to accept the tenant's invitation to rule that its particular obligations, reflecting upkeep burdens on the tenant, somehow derogate from the fundamental—and very specific—"as is" condition of the premises under the lease.

■ The tenant also contends that, even if the lease appears to be unambiguous, extrinsic evidence should be admitted for help in assessing relevant circumstances surrounding the making of the contract. We agree that admission of extrinsic evidence may be appropriate—despite a contract clear on its face—when particular circumstances surrounding the contract's inception tend to show "fraud, duress, or mutual mistake." *Minmar Builders, Inc.*, 246 A.2d at 786; *accord Adler*, 728 A.2d at

---

**7.** According to WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION, "maintenance" means "the upkeep of property, machinery, equipment, etc."

88. The tenant's allegations, however, do not present such a case here; the tenant does not suggest any misrepresentation, pressure, or *mutual* mistake. *See supra* note 4. We have stressed on other occasions, moreover—in responding to what the tenant really is asking us to do here—that under no circumstances will extrinsic evidence be admissible to reveal the subjective intent of a party to a contract unambiguous on its face. *See 1010 Potomac Assocs.*, 485 A.2d at 205–206 (holding that extrinsic evidence of parties' subjective intent "may be resorted to only if the document is ambiguous"); *Bolling Fed. Credit Union v. Cumis Ins. Soc'y Inc.*, 475 A.2d 382, 385 (D.C.1984) (holding that if a contract is facially unambiguous, court must look only to contract language for parties' intent).

\* \* \* \*

■ For the foregoing reasons, we conclude that the lease agreement is not ambiguous; extrinsic evidence was not admissible to construe it; and the tenant, in taking the leased property "as is," comes within no specified exception under the lease that would obligate the landlord to replace the failed heating and cooling units during the term of the tenant's lease.

*Reversed and remanded.*