132 F.3d 85
 328 U.S.App.D.C. 30
 BEAL MORTGAGE, INCORPORATED, f/k/a BSB Mortgage, Inc.,
Appellee/Cross-Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Bell
Federal Savings Bank and Federal Deposit Insurance
Corporation, as Manager for the FSLIC
Resolution Fund,
Appellants/Cross-Appellees.
 Nos. 97-5016, 97-5029.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 27, 1997.
Decided Jan. 9, 1998.
Rehearing Denied March 2, 1998.
 
 Appeals from the United States District Court for the District of Columbia (No. 95cv00164).
 Lawrence H. Richmond, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellants/cross-appellees, with whom Ann S. DuRoss, Assistant General Counsel, was on the briefs.
 Charles A. Gall argued the cause for appellee/cross-appellant, with whom James W. Bowen, Amy Loeserman Klein and John McJunkin were on the brief.
 Before: GINSBURG, SENTELLE and TATEL, Circuit Judges.
 SENTELLE, Circuit Judge:
 
 
 1
 Beal Mortgage, Inc. ("Beal") brought suit under a contract with the Resolution Trust Corporation, later assumed by the Federal Deposit Insurance Corporation ("FDIC"), to purchase for over $7 million several mortgages and real properties of a failed institution taken over by the agency. After stipulation by the parties as to certain facts, the district court granted summary judgment for Beal, holding that the contract obligated the FDIC to pay Beal credits for all pre-closing sales of loan collateral, and to bear responsibility for delinquent property taxes on some of the properties, subject to contractual limitations of liability. We hold that the contract language affords Beal a credit only when collateral property was sold between specified dates, and that contract language pro-rating property taxes does not make the FDIC liable for delinquent taxes, and remand for further proceedings consistent with this opinion.
 
 
 2
 * In January 1993, the FDIC[1] offered to sell by sealed bid a portfolio of loans and real property that it took over from the failed Bell Federal Savings Bank. It provided a Bid Information Package to prospective bidders, which included certain representations and warranties regarding the loans and real property being sold, and a warning that this information was liable to be inaccurate. It soon thereafter provided a Detailed Information Package, which included a valuation known as a Derived Investment Value ("DIV") for each asset, which it described as a value computed "for the sole purpose of allocating the Bid Purchase Price among" the assets in each pool to provide a way to determine the repurchase price in the event that any of the loans in the package had to be repurchased by the FDIC as the result of certain defects. Purchase Agmt., Art I. The FDIC specifically warned bidders not to use the DIV as a basis for formulating their bids. Many of the loans involved were in default, so that their value derived from a purchaser's right to foreclose and sell the underlying collateral.
 
 
 3
 Until the Bid Information Date of April 13, 1993, the FDIC provided updated information about the assets in the pool, to allow bidders to conduct and adjust their own valuation of the assets at issue. On April 20, 1993, Beal submitted the highest bid, and entered a Purchase Agreement with the FDIC. This began a six-month due diligence period during which Beal could determine if there were any breaches of the representations or warranties made with respect to the property it acquired. For example, the Purchase Agreement warranted that the disclosures in the Detailed Information Package accurately reflected the information contained in Bell Savings' files, and that there were no undisclosed delinquent real property taxes on included properties. See Purchase Agmt. §§ 7.3-7.4. It provided limited remedies against the FDIC for any breach of these warranties, generally giving the FDIC the option to cure the defect or repurchase the defective mortgage. See Purchase Agmt. § 5.2. At the Closing Date, Beal closed the transactions but noted that it reserved the right to pursue (through the instant litigation) certain credits and back taxes it thought it was due under the contract.
 
 
 4
 The FDIC has consistently asserted that Beal's only remedy for allegedly defective mortgage loans is via recourse to the contract provisions for breach of warranty. However, applying New York law as required by the Agreement, the district court agreed largely with Beal's proffered interpretation of the Purchase Agreement, and awarded Beal nearly $2.4 million in damages under the provisions for credits and property taxes. In each instance, the district court held the contract unambiguous and entered judgment as a matter of law. Our review of the entry of judgment as a matter of law is de novo. Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C.Cir.1995). Neither party before us argues that the Purchase Agreement is ambiguous, so we do our best to draw clear meaning out of its murky provisions.
 
 II
 
 5
 The first dispute involves whether credits were due to Beal under section 2.3(a)(iii) of the Purchase Agreement with respect to three "Non-Affiliate Mortgage Loans" (i.e., secured by collateral owned by a third party), called "JEMAC," "Ocean Juno," and "Royal Cove." The relevant portions of section 2.3(a) provide the following:
 
 
 6
 The Purchaser shall receive, on the Closing Date, a credit against the Bid Purchase Price in an amount equal to the sum of the following:
 
 
 7
 (i) with respect to the Non-Affiliate Mortgage Loans ... all principal payments received by the Seller thereon (including for this purpose, prepayments, sales proceeds, scheduled principal payments, and condemnation proceeds and insurance proceeds allocated to principal that are not used to restore the Mortgaged Property) after the Pricing Date [March 31, 1993] and prior to the Closing Date ...;
 
 
 8
 ...
 
 
 9
 (iii) amounts received on any Mortgage Loan that were disclosed as being included in the determination of such Mortgage Loan's Initial Derived Investment Value....
 
 
 10
 Beal argues essentially that section 2.3(a)(iii) entitles it to a credit for all sales proceeds, whenever received, deriving from items of collateral that were included in the FDIC's computation of an asset's DIV. The FDIC takes the position that Beal's interpretation would read out of the contract the time limitation explicit in section 2.3(a)(i), and that section 2.3(a)(iii) only allows a credit for "amounts received ... that were disclosed," not amounts deriving from sales of items that were disclosed, as included in DIV. Thus, the FDIC contends that Beal is only entitled to a credit if the sale occurred after the Pricing Date. Otherwise, if the fact of the sale was disclosed, Beal should have adjusted its bid downward, and if not disclosed, Beal must pursue a breach of warranty remedy as defined by the contract.
 
 
 11
 The JEMAC Loan was assigned a DIV of $306,662, based on security of twelve lots. Before the Pricing Date, the FDIC sold eight lots for $704,000 and applied the proceeds to the loan's principal. The FDIC disclosed the sale prior to the Bid Information Date. After the Pricing Date, the FDIC sold the remaining four lots for $100,000 and again applied the proceeds against the principal. Because the second sale occurred between the Pricing Date and the Closing Date, the FDIC credited Beal $100,000 pursuant to section 2.3(a)(i).
 
 
 12
 The Ocean Juno Loan had a DIV of $329,533, secured by two lots. Before the Pricing Date, the FDIC sold one of the lots for $150,000 and applied the proceeds to the loan's principal. After the Pricing Date, the FDIC sold the remaining lot for $170,873 and again applied the proceeds against the principal. The FDIC credited Beal $170,873 because the second sale occurred between the Pricing Date and the Closing Date.
 
 
 13
 The Royal Cove Loan had a DIV of $2,546,152, based in part on collateral including a $650,000 certificate of deposit ("CD"), a subordinated note for $793,400, and certain guaranties. Prior to the Closing Date, the FDIC discovered and notified Beal that the asset files indicated that the CD had been cashed and applied to the loan several years earlier by the now-defunct Bell Savings. Thus, the FDIC claimed that the cash had been shown by mistake, and in response to Beal's complaints, advised Beal to file a claim of defective mortgage loan under section 5.2(b) of the Purchase Agreement.
 
 
 14
 As to the subordinated note and guaranties, the district court found without objection that they had been sold to a third party. The record does not reflect the evidence upon which this finding was based, though it might be a reasonable inference from the fact that these items, disclosed as part of the Royal Cove collateral, were never delivered to Beal. Lacking specific evidence of a sale, the district court unsurprisingly made no finding regarding when such a transaction occurred. Beal's complaint alleges that the sale occurred prior to the Closing Date, and that the FDIC "failed to disclose that the Subordinated Note and Interest Guaranties had been sold prior to the Bid Information Date." Cplt. p 6(b). Reading this statement to allege that the sale occurred before the Bid Information Date (April 13) does not necessarily imply that the sale occurred before the Pricing Date (March 31). Thus, we cannot on the present record determine whether this transaction occurred during the period contemplated by section 2.3(a)(i).
 
 
 15
 Beal bases its arguments on its view of the role of the DIV. Beal claims that bidders were required to formulate bids based upon a percentage of the aggregate DIV. In a past transaction with the agency, Beal noted that the FDIC adjusted the DIV immediately prior to the Bid Information Date to reflect changes in the collateral and the properties in the package. Because the FDIC did not adjust the DIV in this case, Beal asserts that it therefore believed it would be entitled to credits under section 2.3(a)(iii) for items included in DIV calculations that the FDIC disclosed had been sold and applied against principal. The district court, agreeing with Beal, held that section 2.3(a)(iii) allowed a credit for all proceeds, whenever received, deriving from the sale of assets disclosed as being included in the computation of a loan's DIV. Although perhaps a reasonable reading of the cloudy contract provisions at issue, we think this interpretation does not best fit the language and structure of the Purchase Agreement.
 
 
 16
 The Purchase Agreement states that DIVs are provided "for the sole purpose of allocating the Bid Purchase Price among the individual Mortgage Loans ... to provide a method of determining the Repurchase Price or Adjusted Schedule Price in the event any Mortgage Loans are repurchased or revalued." Purchase Agmt., Art. I (emphasis added). Further, the Bid Package noted that any reliance on DIV "shall be solely at the risk of the bidders.... [DIVs] are being provided without any representation or warranty, express or implied, as to their content, suitability for any purpose, accuracy, truthfulness or completeness...." In light of this language, a party could not have reasonably relied upon DIV values to compute credits actually payable under the contract, never mind infer that the inclusion of an item in a DIV calculation automatically entitled it to a credit for that item.
 
 
 17
 Both the language and structure of the Purchase Agreement support the FDIC. Section 2.3(a)(iii) on its face allows a credit for "amounts received ... that were disclosed as being included" in the DIV, not amounts received for properties disclosed as being included. Literally, section 2.3(a)(iii) does not apply to the various properties sold before the Closing Date. The structure of section 2.3 also suggests a more limited reading of subsection (iii): unlike subsection (i), subsection (iii) is not restricted to certain types of payments (a limited list of types of principal payments), to a limited period of time (payments received between the Pricing Date and the Closing Date), or to a single category of mortgage loans ("Non-Affiliate Mortgage Loans"). Beal's interpretation essentially reads the more specific subsection (i) out of the contract in favor of the generally worded, though literally inapplicable, subsection (iii). We will not adopt such an interpretation, which would be inconsistent with the cardinal interpretive principle that we read a contract "to give meaning to all of its provisions and to render them consistent with each other." United States v. Insurance Co. of North Am., 83 F.3d 1507, 1511 (D.C.Cir.1996); Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271, 273 (1955).
 
 
 18
 Thus, the only credits possibly due to Beal under section 2.3(a)(i) involve the proceeds of sales which occurred between the Pricing Date and the Closing Date. With respect to the JEMAC and Ocean Juno loans, the FDIC has already credited Beal with the appropriate amounts. With respect to the Royal Cove loan, if the subordinated note and guaranties were sold and the proceeds applied to the principal of the loan, and if the sale occurred between the Pricing Date and the Closing Date, Beal could be entitled to an additional credit. Without a finding as to the date of this sale, we cannot determine whether Beal is entitled to such a credit. Beal was not on notice that these assets, included in the Detailed Information Package, would not be delivered at closing; but if the sale occurred before the Pricing Date, Beal's only remedy is that which the Purchase Agreement provides for breach of warranty.
 
 
 19
 Under section 2.3(a)(iii), the only "amount" disclosed as being included in DIV was the $650,000 CD included in the Royal Cove Loan package. However, this CD had been applied to the loan's principal before the FDIC took over Bell Savings, and thus the $650,000 cannot be deemed an "amount received" by the FDIC within the meaning of section 2.3(a)(iii). Again, Beal's only remedy against the FDIC for failure to deliver the CD is found in the Purchase Agreement's provisions for breach of warranty.
 
 III
 
 20
 Beal also claims that the Purchase Agreement requires that the FDIC pay $686,465.82 in delinquent property taxes on four real properties transferred under the Purchase Agreement. These taxes, in the form of tax liens against the properties, were disclosed by the FDIC prior to the Bid Information Date. Beal's argument, adopted by the district court, relies completely on a strained interpretation of a single provision of the Purchase Agreement.
 
 
 21
 Section 11.2(b) provides that the purchase price for each Real Property would be $100, adjusted by "expenses (both before and after the Real Property Closing Date)" which would be "prorated as between the Seller and the Purchaser as of midnight of the day immediately preceding the Real Property Closing Date for each Real Property." The expenses to be prorated included, among other things, utility charges, rents, insurance premiums, and "related real estate taxes and all assessments (special and general)." Purchase Agmt. § 11.2(b)(i). Further, if the taxes had not been assessed by the Closing Date, the adjustment would be based on "the rate for the preceding fiscal year applied to the latest assessed valuation...." Purchase Agmt. § 11.2(b)(i). The district court held that the term "related real estate taxes" includes "all real estate taxes and logically includes delinquent taxes," and found significant that "subsection (b) prorates taxes which accrue 'both before and after the Real Property Closing Date[.]' " Beal Mortgage, Inc. v. Resolution Trust Corp., No. 95-0164, slip op. at 11 (D.D.C. March 21, 1996) (brackets in original). This interpretation cannot be deemed consistent with the language and structure of section 11.2(b) or with other provisions of the Purchase Agreement.
 
 
 22
 We find the FDIC's reading more natural. Beal's argument implies that section 11.2(b) requires the purchase price to be adjusted to reflect "all real estate taxes and assessments." But this provision involves adjusting the "purchase price" based on "items of expense" including "related real estate taxes." This language implements nothing more than the apportionment of the current year's real estate taxes, a standard procedure in any real estate closing. "[I]f real estate taxes are paid in arrears, buyer should receive credit for the portion of the current real estate tax fiscal year during which seller had possession." 12 THOMPSON ON REAL PROPERTY § 99.11(e) (David A. Thomas ed., 1994).
 
 
 23
 A parallel provision of section 11.2(b) strongly supports this conclusion. If the "amount of such taxes" is not fixed by the Closing Date, then the Purchase Agreement specifies that the adjustment is to be computed by applying the "rate for the preceding fiscal year" to the "latest assessed valuation" of the property. Purchase Agmt. § 11.2(b)(i). This formula would never take into account unpaid taxes from a prior fiscal tax year. Further, this amount would be again adjusted "when the rate and valuation for the current fiscal year is fixed." Purchase Agmt. § 11.2(b)(i) (emphasis added).
 
 
 24
 Indeed, the Purchase Agreement has other provisions governing transactions involving properties with tax liens or otherwise subject to delinquent property taxes. Section 7.4 warrants that "there will be no delinquent ad valorem real estate taxes" except "as specified in Exhibit J attached hereto." Purchase Agmt. § 7.4(g). Had the FDIC warranted that the properties were not subject to any delinquent taxes, Beal might have a claim for breach of that warranty--but all of the tax liens at issue were indeed listed in Exhibit J. In any event, the parties explicitly provided a mechanism for handling delinquent property taxes, and reading section 11.2(b) to include "all real estate taxes ... includ[ing] delinquent taxes" is inconsistent with the overall scheme of the Purchase Agreement. Thus, Beal is not entitled to any credits for these delinquent property taxes which were properly disclosed by the FDIC prior to closing.
 
 CONCLUSION
 
 25
 We hold that Beal is not entitled to credits for properties and other assets sold prior to the Pricing Date; nor is Beal entitled to a credit for a CD mistakenly included in the computation of DIV, because an item never received by the FDIC cannot be deemed an "amount received" within the meaning of the Purchase Agreement. Further, we hold that Beal is not entitled to an adjustment in purchase price for properties subject to delinquent property taxes, where the tax liability was disclosed by the FDIC. Because the district court did not determine when the Royal Cove subordinated note and guaranties were sold, we remand for a determination on whether the sale occurred between the Pricing Date and the Closing Date.
 
 
 26
 We therefore vacate the district court's order granting summary judgment and damages to Beal. Because we reverse the rulings that hold the FDIC liable for money damages, we do not address at this stage whether section 10.2 of the Purchase Agreement limits the FDIC's liability for contract damages in its capacity as receiver, nor whether a related Guaranty Agreement allows recovery of contract damages from the FDIC in its corporate capacity. The judgment, therefore, is vacated and the matter remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 For simplicity, this opinion refers to the relevant agency as the FDIC, currently a party to this litigation, although the court recognizes that the contract was initially drafted and executed by its predecessor in interest, the Resolution Trust Corporation