Howard B. ADLER, et al., Appellants,

v.

Albert ABRAMSON, et al., Appellees.

No. 97–CV–1808.

District of Columbia Court of Appeals.

Argued Feb. 24, 1999.

Decided April 8, 1999.

Jonathan Tycko, with whom Julia A. Dahlberg, Paul Blankenstein, Miguel A. Estrada, Washington, DC and Jill M. Dennis, McLean, VA, were on the brief, for appellants.

Gregory G. Garre, Washington, DC, with whom John G. Roberts, Jr., was on the brief, for appellees.

Before FARRELL and REID, Associate Judges, and KING, Senior Judge.

FARRELL, Associate Judge:

This appeal is from a judgment, after a bench trial, rejecting claims that the defendants had charged excessive management fees to, and double-billed, the plaintiffs, commercial tenants of a building owned by the defendants and managed through defendants' affiliate companies. The primary question is whether the operating expenses clause of the parties' lease, allowing the tenant to be

charged with, among other things, management fees "not to exceed 5% of gross collections," is subject to an implied condition that those fees not exceed a market rate. The trial court answered the question no, finding the disputed clause to be unambiguous. We agree.[1] Since we also find no abuse of discretion in the court's refusal to consider the double-billing claim, we affirm.

## I.

The building in question, named Washington Square, is owned by the Washington Square Limited Partnership ("WSLP"), in turn comprised of members of two families, the Abramsons and the Lerners. The building is managed jointly by the Tower Companies and the Lerner Corporation, owned respectively by the Abramson and Lerner families. In 1983, after lease negotiations involving the exchange of many drafts, the law firm of Gibson Dunn & Crutcher (hereafter "Gibson Dunn") rented a sizeable portion of the building as office space. The lease provides for two types of rent, Basic Rent and Additional Rent, the latter largely reflecting the annual costs of managing and operating the building. For the most part, the Additional Rent charged consists of "operating expenses," which the lease provision at issue defines in relevant part as follows:

> For purposes hereof, the term *"Operating Expenses"* shall mean all costs and expenses paid or incurred by Lessor in connection with the management, operation, servicing and maintenance of the Building and common grounds including, but not limited to, employees' wages, salaries and welfare and fringe benefits ... [there follows a lengthy enumeration of other expenses]; and management fees not to exceed 5% of gross collections.

The last phrase is at the center of this appeal. During each year of the lease since 1988, when the operating expenses provision took effect, WSLP "paid or incurred" management fees of at least "5% of gross collections" to its management companies and charged them to Gibson Dunn ("passed them through," in the argot of the trade) as an operating expense to the extent allowed, 5%. In 1995, Gibson Dunn brought suit alleging that the management fees charged did not reflect the prevailing market rate for fees charged by other management companies. As amended, the complaint also alleged that reading the lease to allow a pass-through of 5% without regard to market rate violated an implied covenant of good faith and fair dealing.

## II.

WSLP argued at trial, and the trial court agreed, that the lease unambiguously allows WSLP to pass through management fees which it actually pays or incurs, provided that—and only that—the fees do not exceed 5% of gross collections. Gibson Dunn disputes this conclusion by asserting that the parties meant the 5% figure to be a *cap* on annual pass-throughs, but that the actual percentage charged each year would be determined by market usage, *i.e.*, the prevailing market rate. Gibson Dunn presented testimony at trial to establish that the market rate during the leasing period was no more than 3% of gross rents; WSLP presented contrary evidence that there was no single market rate for management fees.

■■■■ Under the "objective law" of contract interpretation followed by this court, *Sagalyn v. Foundation for Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997), the written language of a contract governs the parties' rights unless it is not susceptible of clear meaning (or is the result of fraud, duress, or mutual mistake). *Id.*; *Minmar Builders v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C.1968). In deciding whether contract language has a "clear meaning," the court asks " 'what a reasonable person in the position of the parties would have thought the disputed language meant.' " *Sagalyn*, 691 A.2d at 111 (quoting *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C.1982)). The reasonable per-

---

1. The trial court found alternatively that if the language of the provision was ambiguous, the circumstances as a whole demonstrated that the parties had not intended to tie the management fees that could be charged the lessee to a market rate. Our conclusion makes it unnecessary to reach this alternative finding.

son is presumed to know " 'all the circumstances before and contemporaneous with the making of the [agreement],' " and "is bound by all usages which either party knows or has reason to know." *Id.* (citation omitted).

■ A reasonable person reading the "operating expenses" provision would see that it places two limits on the management fees the lessor may pass through. First, those fees must have been "paid or incurred" by the lessor, and second, they may not "exceed 5% of gross collections." The provision contains no express third limitation that such fees must be "reasonable" as determined (in Gibson Dunn's words) by "some outside measure," namely market rate. The absence of this additional qualifier is conspicuous because, elsewhere in the lease, the parties expressly referred to "fair market . . . value" or a similar external measure when they meant to incorporate that standard. Even more, as the trial court pointed out, they provided a mechanism by which market value could be determined and a means for resolving disputes over it.[2] The absence of such a reference in regard to management fees is an objective indicator that the parties intended no other conditions than those specified.

Gibson Dunn points out that "it is common practice for courts to imply a price term based on prevailing rates and industry custom." But the cases it cites for this proposition dealt with agreements that "contain[ed] no standard as to the price to be paid." *Day v. Len–Metal–Fab, Inc.,* 3 Conn.Cir.Ct. 249, 212 A.2d 426, 428 n. 1 (1965). The agreement here expressly states the management fees WSLP may recover—those it in fact incurs, so long as they do "not . . . exceed 5% of gross collections." There is no third term

to be applied unless one *assumes,* with Gibson Dunn, the point at issue: that the pass-through must conform to market rate. Gibson Dunn also observes that none of the other operating expenses listed is qualified by a market-based or reasonableness standard, leading it to ask (rhetorically) whether WSLP could charge the lessee with plainly unreasonable wages, janitorial costs, or other expenses. But no other operating expense is qualified by the cap "not to exceed," and thus none but management fees supplies a standard for what the parties objectively meant to be a reasonable charge, *i.e.,* fees incurred *and* not exceeding 5%.

■ Furthermore, Gibson Dunn's attempt to prove at trial that a prevailing market rate (and thus a customary usage of the term "management fees") exists failed as a matter of fact.[3] Its expert, Larry Goodwin, testified that there *is* a market rate for management fees charged by owner-managed "Class A" buildings such as Washington Square—3% of gross rents. WSLP presented its own expert, Gregory Leisch, who denied there is a single market rate; rather, in his opinion, there is a range of management fees for buildings comparable to Washington Square of between 2 and 6% (an estimated 90% of buildings being in the 3–5% range). Weighing this competing testimony, the trial court concluded:

> The fact [is] that a market rate for management fees cannot be found in any ready source[,] and such a rate can only be discerned by individual surveys of the marketplace[; hence] the absence of a practical mechanism to identify the market rate is evidence that the parties did not intend there to be such a market rate limit.

---

2. Thus, for example, in setting the amount of rent in certain future years, the lease states that WSLP must take into account the "fair market rental value of the Leased Premises." And in establishing a renewal option, it states that WSLP must recalculate the rent based on the "fair market rental value of the Leased Premises as determined by [WSLP]," then provides that "[i]n the event a dispute arises regarding [WSLP's] determination of the fair market rental value of the Leased Premises, such dispute shall be submitted to arbitration as provided herein." Other provisions of the lease specifically refer to, and incorporate for purposes of calculating cer-

tain amounts, the "Consumer Price Index for All Urban Consumers."

3. A party commonly shows a usage by producing expert witnesses who are familiar with the activity or place in which the usage is observed. Their testimony must establish that the practice or method of dealing has such regularity in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.13, at 311–12 (2d ed.1998) (footnote and internal quotations omitted).

Shown no "practical mechanism to identify *the* market rate" (emphasis added), the trial court rejected as a matter of fact Gibson Dunn's contention that market usage supplied a reasonable measure of chargeable fees beyond that stated in the lease. Put differently, it found that while there may be a market rate ascertainable through surveys, it is not of such common knowledge that either party could be expected to be bound by it. *See* FARNSWORTH, *supra* note 3.

■ Moreover, in sharp contrast to the equivocal evidence of custom and usage was the proof of the "circumstances surrounding the making of the contract." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205–06 (D.C.1984). The trial court found, and the record confirms, that the lease was "executed only after intense bargaining and scrutiny by the parties[,] and it seeks to address every conceivable aspect of the landlord and tenant relationship between Gibson Dunn and WSLP." Although operating expenses were only part (even a modest part) of that bargaining, Gibson Dunn expressly raised the issue of management fees in the course of the negotiations. Specifically, in initial drafts it voiced concern in writing over the pass-through of "[o]verhead and profit ... paid to ... affiliates of Landlord for services in the Building to the extent the same exceeds the costs of comparable services rendered by unaffiliated third parties on a competitive basis." Gibson Dunn's negotiator, Edward Geisinger, admitted that this "was an explicit request by Gibson Dunn to ... limit the ... lease to market [rate] with regard to management fees," and WSLP too understood it that way (its negotiator recognizing that "[t]here was no other affiliated party charge"). WSLP rejected in writing the request to incorporate a "competitive" or market rate standard, even while agreeing to two other operating expense exclusions Gibson Dunn had demanded.[4] The absence from the signed lease of a limitation on which the parties had explicitly bargained, in a final agreement containing an inte-

gration clause (as this one did), is strong indication that the parties reasonably meant to bind themselves only by the words they employed. *See Hercules & Co. v. Shama Restaurant Corp.,* 613 A.2d 916, 930 (D.C. 1992) (quoting *One–O–One Enters. v. Caruso,* 270 U.S.App.D.C. 251, 255, 848 F.2d 1283, 1287 (1988)).

■ Gibson Dunn's final argument is that reading the lease to allow WSLP routinely to pass through management fees without reference to market rate violates the implied covenant of good faith and fair dealing. *See generally Hais v. Smith,* 547 A.2d 986, 987–88 (D.C.1988). This argument, however, is no stronger than the assertion that there is an objective measure of a reasonable (or "fair") management fee different from the standard the parties wrote into the lease. As we have seen, Gibson Dunn proved no such rate. It concedes that to satisfy the implied covenant of fair dealing WSLP need only have exercised the discretion conferred on it by the lease[5] "reasonably and ... not ... arbitrarily or capriciously" (citing, *inter alia, Foster Enters., Inc. v. Germania Fed. Sav. & Loan Ass'n,* 97 Ill.App.3d 22, 52 Ill.Dec. 303, 421 N.E.2d 1375, 1381 (1981)). A rate capped at 5%, when the evidence failed to show a lower single market rate, is almost self-evidently reasonable, and is not made less so by the fact that WSLP contracted with affiliated companies to manage the building. Gibson Dunn knew before leasing that the management would be performed by affiliates, and that the protection WSLP offered against this fact—despite Gibson Dunn's request for more—was the 5% cap. Moreover, Gibson Dunn's negotiator considered the affiliate relationship "a positive selling point"—*i.e.,* "[y]ou can rely on [them] to take better care of [the building]"—notwithstanding the non-competitive effect this might have on the management fee charged. In short, WSLP could not have breached its duty of fair dealing when reasonable persons in the parties' shoes would have expected the

---

4. These were so-called ownership costs and leasing commissions.

5. *I.e.,* WSLP had discretion as to its choice of management companies, presumably the amount

of fees incurred (by dealing with affiliates), and the amount of fees it chose to pass through, up to the 5% cap.

contract to be performed as it was. *See* FARNSWORTH, *supra* note 3, § 7.17(b), at 378–79 & n. 27.

### III.

Gibson Dunn further argues that even if the lease permitted WSLP to charge it with a 5% management fee, WSLP exceeded that limit during the years in question by passing through as expenses both management fees of 5% *and*, separately, the salaries of three on-site management employees.[6] The trial court ultimately refused to address this "double-billing" claim after determining that Gibson Dunn had raised it for the first time in its proposed findings of fact and conclusions of law following trial. Gibson Dunn argues on appeal that it did raise the issue in the joint pretrial statement, and that, in any event, the court should have treated it as an issue "tried by express or implied consent of the parties," hence requiring resolution on the merits. *See* Super. Ct. Civ. R. 15(b) (1998); *Moore v. Moore*, 391 A.2d 762, 768 (D.C.1978).

■■■ We reject Gibson Dunn's reliance on the pretrial statement, for the reason alone that the statement is not part of the record on appeal. *See Cobb v. Standard Drug Co.*, 453 A.2d 110, 111 (D.C.1982). Moreover, reading the passages it cites together with the amended complaint, we find no reason to disturb the trial court's finding that the double-billing issue was not raised before trial. Rather, Gibson Dunn alleged in the complaint what it concedes is "a dif-ferent claim" that WSLP passed through as management fees the salary of the on-site building manager, Dawn Munson, despite the express exclusion from the definition of "operating expenses" for compensation of an "executive" of WSLP, which Gibson Dunn alleged Munson to be.[7]

■■■ We also reject the argument that the double-billing claim was tried by implied consent at trial. The trial court's decision on this issue (hence on whether the pleadings must be amended to conform to the proof) is reviewed for abuse of discretion. *See Moore*, 391 A.2d at 768; *Laffey v. Northwest Airlines, Inc.*, 185 U.S.App. D.C. 322, 371 & n. 370, 567 F.2d 429, 478 & n. 370 (1976). Substantively, the question is whether Gibson Dunn presented evidence which the parties must have recognized as " 'aimed at the unpleaded issue,' " *Rosenthal v. National Produce Co.*, 573 A.2d 365, 372 (D.C.1990) (citation omitted); only if that evidence was "clearly apposite to the new issue but not to other matters specified in the pleadings" could WSLP be found to have had adequate notice and an opportunity to litigate it. *Moore*, 391 A.2d at 768.

■■■ Review of the testimony bears out the trial court's conclusion that the issue of double billing—*i.e.*, pass-through of the entire management staff's salary—was not tried. Although Gibson Dunn presented evidence of the management staff salaries, it did so always within the framework of its challenge to Munson's salary as that of a claimed "executive."[8] Even if Gibson Dunn intended

---

6. While the "operating expenses" provision allowed the lessor to pass through its own "employees' wages [and] salaries," the salaries of any management company employees presumably would have been included in the management fees charged to the lessee.

7. The trial court, as factfinder, rejected this claim chiefly because Munson "was not proven to be [an] ... executive ... of the lessor."

8. For example, when the trial court pressed Gibson Dunn's counsel regarding the focus of the salary claim, this dialogue ensued.
   *Counsel:* We have put in evidence, ... as to what their own general ledger indicates was the payroll to the manager and the office.
   *Court:* Three people.
   *Counsel:* That made a reasonable—
   *Court:* Three people.
   *Counsel:* We even made a reasonable approximation of what those damages are.
   *Court:* No, well, your damages would not be for the offices for—at least according to the pretrial order it is for her salary, right?
   *Counsel:* Compensation paid to Ms. Munson [the building manager] or the—whoever the on-site building manager was.
   . . .
   *Court:* So we're talking about one of three people, one salary and an office which has three people. . . .
   . . .
   *Counsel:* Mr. Bowersox was not able to divide up—who was paid what in the salaries ... during the course of the deposition. . . .

to raise the broader double-billing issue, its evidence was not "clearly apposite to [that] issue but not to [the] matter[ ] specified in the pleadings," *i.e.*, the manager's salary. *Moore*, 391 A.2d at 768. As a result, the trial court could properly find that WSLP had not received the requisite notice and opportunity to litigate the issue.[9] The court did not abuse its discretion in refusing to conform the pleadings to an issue *not tried by consent.*

*Affirmed.*

**9.** WSLP pointed out to the court post-trial that had it known Gibson Dunn was challenging the pass-through of salaries other than Munson's, "it might have produced the [other] individuals to testify at trial regarding their duties, employment arrangements and salaries"—presumably to show that their non-executive salaries were paid by WSLP, hence could be charged to the tenant under the lease.