van Gestel, J.
This matter comes before the Court on cross motions for summary judgment. Both the plaintiff, The Trustees of Boston College (“Boston College”), and the defendant, The Big East Conference (“Big East”), assert that there are no material facts in dispute and that what is basically involved is the interpretation of the Amended and Restated Constitution of The Big East Conference (the “Constitution”).
The situation that underlies this case is a poster child for the dilemma faced by America’s colleges and universities in maintaining the proper balance between their primary mission of academic excellence and the operation of big-time intercollegiate athletic programs.[1] Boston College has chosen to leave the Big East Conference, in which it is one of the Football Schools, and join the Atlantic Coast Conference. At issue is the validity of efforts by the Big East to quintuple the economic penalty and more than double the pre-withdrawal notice period, all designed to discourage Conference members from leaving the Conference and punishing them if they do so. In the litigation process spawned,[2] respected college and university presidents charge each other with bad faith, with breaches of fiduciary duties, with misrepresentations and with worse. And any penalty, particularly one of $5 million, must be paid from funds that otherwise would be available for the academic program or scholarship aid.
While not presented before this Court, it must be observed that there are serious legal questions surrounding the enforceability of the penalties involved. It is not at all apparent that the withdrawal payment of $ 1 millionto say nothing of $5 millioncan be characterized as liquidated damages. In his deposition, the Commissioner of the Big East gave the following testimony.
Q. You intended this amendment to make it more difficult for Boston College to join the ACC, is that correct?
A. Yes.
Q. And you were going to make it more difficult for Boston College by requiring them to pay more money and wait longer before they could leave, is that right?
A. Yes.
Earlier in the deposition, the Commissioner said:
Q. Why was [the language dealing with downgraded programs] not included in the faxed amendment?
A. There was no urgency on this particular issue.
*178 Q. So it would have been considered in the ordinary course on November 4th?
A. Yes.
Q. The urgency was the amount of the penalty and the notice period?
A. Yes.
Q. And that was related to BC possibly leaving?
A. Yes.
For the withdrawal fee to be acceptable as liquidated damages, the amount should provide no more than the protection needed, must approximate the actual loss suffered, and cannot be insufficiently related to the harm involved. If the exit payment is otherwise, it would constitute an unreasonable penalty which would be void and legally unenforceable. See, e.g., Wilson v. Clarke, 470 F.2d 1218, 1222 (1st Cir. 1972); Perfect Solutions, Inc. v. Jereod, Inc., 974 F.Sup. 77, 82-83 (D.Mass. 1997); Security Safety Corp. v. Kuzniki, 350 Mass. 157, 158 (1966); A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 675 (1956).
BACKGROUND
The Big East is a non-profit corporation formed under the laws of the District of Columbia. It is an athletic conference whose members are colleges and universities who participate in intercollegiate athletics in the National Collegiate Athletic Association (“NCAA”).
The Big East was formed in 1979. In 1991, several existing Big East members, along with certain “affiliate members,” formed the Big East Football Conference (individually, the “Football Schools,” and collectively, the “Football Conference”). Although the Big East and the Football Conference originally operated as separate entities, the two eventually merged and adopted a single Constitution to govern the surviving corporation. This Constitution is dated April 24, 2000, and is entitled the Amended and Restated Constitution of the Big East Conference. Boston College is included as a Charter Member. This post-merger Constitution and amendments are at issue in this litigation.
In addition to the Football Schools, there also is a group of colleges and universities in the Big East referred to as the “Basketball Schools.”
The Constitution was amended on April 16, 2001. The amendments involved seven substantive changes, including eliminating reference to Temple University, which had been a member of the Football Conference, changes in the entitlement to vote on any waiver of certain member responsibilities and covenants, and the suspension, expulsion or probation of a member. These amendments were accomplished by the execution of a “Joint Consent” mailed by the Big East Commissioner to the Presidents/Chancellors of the constituent colleges and universities. There was no separate meeting regarding these amendments.[3]
Because of overtures in the spring, summer and early fall of 2003, by the Atlantic Coast Conference (“ACC”) to, and the consequent withdrawals of certain of the Football Schoolsparticularly the University of Miami and Virginia Polytechnic Institute and State Universityconcerns were expressed by many Big East members about “stabilizing” the conference. One proposal being considered was the adoption of a constitutional amendment calling for a $5 million penally, 27-month withdrawal provision. The penalty/withdrawal provision then in place called for a $1 million penally and a 12-month withdrawal notice period.
Boston College, at least until shortly after an October 1, 2003 meeting[4] of the subcommittees from the Football Schools and the Basketball Schools, had consistently expressed its agreement with the $5 million penally, 27-month withdrawal provision. Indeed, by July 9, 2003, nine of the twelve Presidents/Chancellors of the Big East had expressed their favorable response to this proposition. However, no action to amend the Constitution to effectuate this change was attempted until October 2003.
At the October 1, 2003 subcommittees meeting, William P. Leahy, S.J. (“Father Leahy”), the President of Boston College, is recorded in the minutes as having spoken “to the potential of a possible marriage between Boston College and the ACC.” Father Leahy is further recorded as explaining “that because of recent media reportsand at his board’s urginghe must determine how genuine the ACC’s reported interest in Boston College as a potential 12th member is before he is willing to commit BC to an exit penally larger than the already agreed to $5M.”[5] Shortly before that time, the University of Notre Dame had suggested imposing an even larger withdrawal penalty, but no action on that suggestion was taken at the October 1, 2003 subcommittees meeting.
On October 6, 2003, Father Dobbin, President of Villanova University, as Chair of the Big East Presidents, submitted by facsimile transfer to the other Presidents/Chancellors an explanatoiy memorandum and a ballot, to be returned also by facsimile, requesting a vote on a proposed amendment to the Constitution to include the $5 million penalty, 27-month withdrawal provision. This voting-by-facsimile process relied upon Section 5.05 of the Constitution. The proposal received the requisite number of favorable votes according to a report from the Big East Commissioner dated October 6, 2003, and sent on October 7, 2003. However, the vote was not unanimous, as both Boston College and Notre Dame abstained.
On October 12, 2003, Boston College, in writing, notified each member of the Big East, as well as the Big East Commissioner, that it was withdrawing from The Big East Conference effective as early as possible under the Constitution. According to the provisions of the April 21, 2001, Constitution, before the purported October 6, 2003, amendment, Boston College’s withdrawal would be effective as of June 30, 2005, and its withdrawal fee *179 would be $1 million to be paid by June 1, 2005. If the October 6, 2003, amendment is valid, Boston College’s withdrawal date would not be effective until June 30, 2006, and the withdrawal fee would be $4 million larger.
Certain parts of the Big East Constitution apply to the present situation. They read as follows.
3.06. Withdrawal of Member
(a) A “Conference Year” begins July 1 and ends June 30. All withdrawals shall be effective at the beginning of the Conference Year. A Member may withdraw from the Conference by providing written notice to each of the other Members and the Commissioner at least one year in advance of the start of the Conference Year for which the withdrawal shall be effective. For example, a withdrawal effective for the Conference Year commencing July 1, 2002 must be given no later than June 30, 2001.
(b) If such withdrawal notice is timely given in accordance with subsection (a) above, the withdrawing Member shall pay the Conference a withdrawal fee of $1 million.
(c) If such withdrawal notice is not timely given in accordance with subsection (a) above, the withdrawing Member shall pay the Conference a withdrawal fee of $2 million.
(d) The withdrawal fee shall be paid in full prior to June 1 of the last Conference Year during which the withdrawing school shall be a Member. For example, for the Member who gives notice of withdrawal effective July 1, 2002, such withdrawal fee shall be paid no later than June 1, 2002.
(f) A withdrawing Member shall cease to have voting rights under this Constitution on the date a withdrawal notice is given irrespective of the effective date of such withdrawal.
3.08. Termination of Membership Rights. In the event of withdrawal ... all rights of a Member in the Conference and in the rights and assets of the Conference shall cease as of the effective date of withdrawal.. .; provided, however, that in the case of withdrawal, voting rights shall terminate prior to the effective date of termination in accordance with Section 3.06(f) hereto . . .

ARTICLE IV. Voting Quorum

Each Member in good standing entitled to vote on a specific matter shall be entitled to one (1) vote. That vote shall be cast by the President/Chancellor or his or her designee (the “Voting Delegates”), except where such vote, under this Constitution, is required to be cast by the Presidents/Chancellors. Voting by proxy is prohibited.
To constitute a quorum for the transaction of business, a majority of the Voting Delegates entitled to vote on the matters presented at the meeting must be in attendance. Except where provisions of this Constitution specify a greater voting requirement, a majority vote of the Voting Delegates in attendance and entitled to vote on a given matter shall be required to effect action at such meeting.
5.05. Actions Without A Meeting. No Conference action shall be taken except at regular, annual, or special meetings of the Presidents/Chancellors or at regular, annual, or special meetings of the Directors,[6] provided, however, upon request of the chair of the Presidents/Chancellors, or the chair of the Directors, as the case may be, a mail, fax or telephone vote may be authorized. A majority of the Presidents/Chancellors or a majority of the Directors, as the case may be, at respective meetings, shall be required to effect an action without a meeting except where the provisions of this Constitution specify a greater voting requirement.

ARTICLE VIII. Amendments.

This Constitution may be amended at any regular or special meeting of the Presidents/Chancellors by a two-thirds (2/3) vote of the Presidents/Chancellors. Any proposed amendment must be submitted to the Commissioner ten (10) days before the meeting at which said amendment is to be considered, so that the proposed amendment may be distributed with the agenda. All amendments shall become effective upon ratification unless otherwise specified.
DISCUSSION
“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R.Civ.P. Rule 56(c). Here, of course, both parties have moved for summary judgment, and both argue that there are no material facts in dispute that would prevent granting such judgment.
An actual controversy has arisen between Boston College and the Big East relating to the interpretation of the Constitution, particularly with regard to the amendment process. The controversy is specifically set forth in the pleadings. This Court, therefore, has the authority to make binding declarations of right, duty, status and other legal relations as sought by the parties in connection therewith. G.L.c. 231 A, Sec. 1. The procedure under Sec. 1 “may be used to secure determinations . . . under written contracts or other writings constituting a contract...” G.L.c. 231A, Sec. 2. Sears, Roebuck & Co. v. School Committee of Burlington, 3 Mass.App.Ct. 399, 400-01 (1975).
*180 At the outset, this Court observes that the Big East is an entity incorporated in the District of Columbia. Consequently, the law of the District of Columbia must govern those aspects of the claims that relate to the internal affairs of The Big East Conference. Harrison v. NetCentric Corporation, 433 Mass. 465, 469-72 (2001). Thus, in interpreting the Constitution, this Court shall have that law in mind. Fortunately, however, the law of the District of Columbia relating to the interpretation of documents like the Big East Constitution is not in any significant way different from the law of Massachusetts.
The Constitution is in essence a contract among the members of the Big East. It is subject, therefore, to the law governing the interpretation of contracts. Johnson v. Fairfax Village Condominium IV Unit Owners Ass’n, 548 A.2d 87, 91 (D.C. 1988). See Jessie v. Boynton, 372 Mass. 293, 303 (1977).
Whether a contract is ambiguous is a question of law for the Court. Rivers & Bryan, Inc. v. HBE Corp., 628 A.2d 631, 635 (D.C. 1993); Potomac Elec. Power Co. v. Mirant Corp., 251 F.Sup.2d 144, 148 (D.D.C. 2003). See Auclair v. Thomas, 39 Mass A.pp.Ct. 344, 347 (1995). A contract is unambiguous when a Court can ascertain the contract’s meaning by merely looking at the contract itself. Potomac Electric, supra, 251 F.Sup.2d at 149. If, however, the provisions of a contract are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, then there is ambiguity. Id. at 148-49. See Suffolk Constr. Co. v. Lonco Scaffolding Co., 47 Mass.App.Ct. 726, 729 (1999). The mere fact that the parties themselves disagree on a contract’s meaning, however, does not alone create ambiguity. Potomac Electric, supra, 251 F.Sup.2d at 148. See also Dist No. 1 -Pacific Coast Dist v. Travelers Cas. and Sur. Co., 782 A.2d 269, 274 (D.C. 2001).
A contract must be interpreted as a whole, giving reasonable, lawful and effective meaning to all its provisions. 1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc., 485 A.2d 199, 205 (D.C. 1984). See ER Holdings, Inc. v. Norton Co., 735 F.Sup. 1094, 1098 (D.Mass. 1990). A Court should attempt to give effect to all provisions of a contract and avoid reading out any portions. Beal Mortgage, Inc. v. FDIC, 132 F.3d 85, 88 (D.C.Cir. 1998). See Computer Systems of America v. Western Reserve Life Assurance Co., 19 Mass.App.Ct. 430, 437 (1985).
The written language of a contract governs the parties’ rights unless it is not susceptible of “clear meaning” or is the result of fraud, duress or mistake. Adler v. Abramson, 728 A.2d 86, 88 (D.C. 1999); Sagalyn v. Foundation for the Preservation of Historic Georgetown, 691 A.2d 107, 111 (D.C. 1997). Words of a contract are to be given their ordinary and usual meaning. IcL In doing so, the Court must question “what a reasonable person in the position of the parties would have thought the disputed language meant.” Patterson v. District of Columbia, 795 A.2d 681, 683 (D.C. 2002). “The endeavor to ascertain what a reasonable person in the position of the parties would have thought the words of a contract meant applies whether the language is ambiguous or not.” Fairfax Village Condominium VII Unit Owners’ Ass’n v. Fairfax Village Community Ass’n, Inc., 726 A.2d 675, 677 n.4 (D.C. 1999). The objective reasonable person assessing a contract is “presumed to know ‘all the circumstances before and contemporaneous with the making of the [agreement]’ and is ‘bound by all usages which either party knows or has reason to know.’ ” Adler, supra, 728 A.2d at 88-89.
The parties here are colleges and universities, acting through their Presidents and Chancellors. The Court takes notice that at least eight, maybe nine, of the Charter Member universities in the Big East have their own well-respected law schools and many have their own in-house counsel. This Court will presume, therefore, a significant degree of sophistication and familiarity by those Presidents and Chancellors with documentslike the Constitution heregoveming nonprofit institutions, as well as with the plain meaning of the English language.
The Court turns first to Article VIII which, by its title, is said to govern “Amendments.” Except for an oblique mention in Section 7.05 prohibiting the Executive Committee from making decisions relating to, among other things, amendments, Article VIII is the only article or section specifically addressing amendments, and it purports only to deal with amendments. It thus deserves to be construed with some indicia of primacy on the subject.
Article VIII is straightforward and unambiguous. It contains only three declarative sentences.
The first sentence of Article VIII provides that the Constitution “may be amended at any regular or special meeting of the Presidents/Chancellors by a two-thirds (2/3) vote of the Presidents/Chancellors.” Simply stated, there must be a meeting of the Presidents/ Chancellors, regular or special. It seems clear that “Voting Delegates,” who are said by Article IV to be designees of a President/Chancellor, cannot be voting participants in the amendment process.
This first sentence also sets the voting requirements for an amendment at two-thirds of the Presidents/Chancellors. This sentence does not, however, make any provision for the number of Presidents/Chancellors who must be present to constitute a quorum at a meeting at which an amendment is to be voted upon.
This Court reads the first sentence of Article VIII as requiring three things: (1) a meeting; (2) at which Presidents/Chancellors must be present; and, (3) that for any vote on an amendment to carry, at least two-thirds of all Presidents/Chancellors must vote in favor.
The second sentence of Article VIII sets forth the procedure or notice that must be followed on an amendment-vote. The “proposed amendment must be submitted to the Commissioner ten (10) days before *181 the meeting ... so that the proposed amendment may be distributed with the agenda.”
This Court reads the second sentence of Article VIII as requiring two things: (1) the proposed amendment must be submitted to the Commissioner at least ten days before the meeting, and (2) the Commissioner must distribute the amendment to the Presidents/ Chancellors, with the agenda for the meeting, at which the vote is to be taken.
The third sentence of Article VUI simply states the time when an amendment shall become effective: on ratification, unless otherwise specified in the amendment vote.
There is no dispute between the parties that Article VIII was not followed with regard to the purported amendment on October 6, 2003.
The Big East argues, however, that it was not required to follow Article VIII in adopting the amendment in issue. It points to Section 5.05 of the Constitution, entitled “Actions Without a Meeting.” This Section is part of Article V, which itself is entitled “Meetings; Governance.” Section 5.05 contains just two sentences, each of which requires some analysis.
Some of the Members of the Big East have suggested that the idea behind Section 5.05 was “getting maximum flexibility for decision making” for Presidents and Chancellors whose busy schedules made it difficult for them to attend meetings.
In pertinent part, the first sentence of Section 5.05 mandates that “[n]o Conference action shall be taken except at a regular, annual, or special meeting of the Presidents/Chancellors... provided, however, upon the request of the chair of the Presidents/Chancellors ... a mail, fax or telephone vote may be authorized.” This sentence regulates voting on “Conference action.” The phrase, however, is not otherwise defined in the Constitution. Objective reasonable Big East Presidents/Chancellors assessing this Section are presumed to understand the phrase “Conference action” to mean any regular business of the Conference requiring their vote or that of their Voting Delegates. This Court does not presume, however, that objective reasonable Big East Presidents/Chancellors would consider Section 5.05 to apply to amending the underlying governing document of the Conference. If the latter were the case, it would substantially write outwithout directly saying sothe meeting and pre-meeting notice requirements of Article VIII, the only Article that specifically speaks to the amendment process. Such a sub silentio emasculation of a specific directive should not occur.
Further, from whom, and how, should the chair of the Presidents/Chancellors “request” authorization for such a vote without a meeting? Can he or she just decide to do it on his or her own wish? Perhaps the other sentence of Section 5.05 sheds light on this issue. In pertinent part, the second sentence reads: “A majority of the Presidents/Chancellors ... at respective meetings, shall be required to effect an action without a meeting except where the provisions of this Constitution specify a greater voting requirement.” (Emphasis added.) This sentence certainly takes care of Article VUI’s two-thirds voting requirement for amendments. But it says absolutely nothing about the pre-voting agenda/amendment notice requirements. Further, how should the Court interpret the phrase “at respective meetings,” that follows “Presidents/Chancellors," in this sentence? Does that mean that enough Presidents/Chancellors to constitute a quorumwhatever that number may be when dealing with an amendmentmust be present at a meeting and accept or agree to the chair’s “request” to vote on the issue by mail, fax or telephone? Or does “at respective meetings” meanagain without saying so explicitlysomething in substance like “at meetings or at times of actions without meetings when voting by mail, fax or telephone are permitted” a majority, or higher number if required, must vote? While perhaps either interpretation could be made, neither is immediately apparent, although the former seems more likely than the latter. What is clear, however, is that neither interpretation constitutes some kind of unspoken overlay on the Article VIII requirements. The possible meanings are of no significance to the issues in this case.
If two provisions of a contract are in conflict, the specific provision controls over the more general provision. Southwestern Elec. Corp., Inc. v. FERC, 347 F.3d 975, 982 (D.C.Cir. 2003). Here, Article VIII is specific on the issue of amendments to the Constitution; while Section 5.05 is general in its application, if it deals at all, with amendments.
The Constitution is an instrument of significant character designed to establish fundamental maxims and to fix an objective standard of conduct by which all Members of The Big East Conference are bound until, of course, it is changed by a proper action of those Members. Given the simple clarity of Article VIII, and the uncertainties as to whether Section 5.05 even deals with amendments, this Court cannot correctly read the Constitution as a rational whole, giving each part some fair role, and conclude that Section 5.05 is an unspoken optional alternative to Article VIII to effect changes in the governing document of The Big East Conference. The Court rules, therefore, that Article VIII sets forth the sole requisites and procedure for amending the Constitution;[7] and Article VIII was not followed on October 6, 2003. Consequently, the purported amendment to increase the withdrawal penalty to $5 million, and to extend the withdrawal notice to 27 months, has not been adopted.
The Big East further argues that, whatever the law may be, Boston College is precluded or estopped from objecting to the manner of the October 6, 2003, amendment because it breached certain fiduciary duties to the Big East and engaged in inequitable conduct. See International Tours & Travel Inc. v. Khalil 491 A.2d 1149, 1155 (D.C. 1985); Amerada Hess Corp. *182 v. Garabedian, 416 Mass. 149, 155-56 (1993). What the Big East charges as breaches of fiduciary duty and inequitable conduct are summarized by it as:
Boston College purported to be committed to participating in the rebuilding efforts following the defection of Miami and Virginia Tech from the Big East while secretly plotting to join the ACC. Furthermore, Boston College deceptively sought to use the very amendment at issue in this case, which Boston College itself proposed and, remarkably, now challenges, as part of its plot to join the ACC.
See The Big East Conference’s Memorandum in Opposition to Plaintiffs Motion for Summary Judgment at p. 18.
Boston College is alleged to have played off one conference against the other, urging the ACC to act quickly and lulling the Big East into delaying taking any punitive action.
The facts alleged by the Big East, howevereven if assumed to be true for the sake of these motionswould not estop or preclude Boston College from challenging the effectiveness of the purported October 6, 2003, amendment.
“In order to deny relief to a party because of inequitable conduct, the conduct at issue must directly affect the claim being brought.” Amerada Hess Corp., supra 416 Mass, at 156. In this case the claim being brought is whether the Big East properly followed the procedures of its Constitution for making amendments thereto. Consequently, the improper conduct with which Boston College is chargedand upon which this Court makes no finding or rulingmust involve its impeding or interfering with the Big East’s ability to effect the amendment in question, or otherwise causing the amendment to be ineffective. See Flynn v. Haddad, 25 Mass.App.Ct. 496, 506 (1988). But whatever Boston College may have said about its state of discussions with the ACC or its expressed acceptance of a $5 million penalty, 27-month withdrawal provision, that did not impede the Big East’s ability to correctly amend its Constitution or otherwise caused the purported amendment to be defective. Consequently, there is no basis to deny relief here.
The parties each have agreed that a declaratory judgment is appropriate in this case. Further, the Big East conceded at oral argument that Boston College, as a withdrawing Member of the Big East, shall cease to have voting rights on the date its withdrawal notice was given, but retains all other rights as a Member of the Conference until its withdrawal becomes effective.
ORDER
For the foregoing reasons, the Motion of the Trustees of Boston College for Summary Judgment, (Paper #31), is ALLOWED and the Defendant The Big East Conference’s Motion for Summary Judgment, (Paper #32), is DENIED. A final judgment shall enter accordingly, including declarations that:
(1) the October 6, 2003 amendment to the Big East Constitution was not adopted in accordance with the Constitution and is therefore null and void, and Boston College is entitled to withdraw from the Big East Conference on July 1, 2005, upon payment of a$l million withdrawal fee,[8] or before July 1,2005, upon payment of a $2 million withdrawal fee; and
(2) until the effective date of Boston College’s withdrawal from the Big East Conference, it is entitled, with the exception of voting rights, to all rights and benefits provided to other Members of the Big East Conference, including attending and participating in meetings, acting as a director, officer or committee member and receiving any and all materials and/or information provided to other Members of the Big East Conference, such as meeting agendas, notes, reports, budgets, minutes and proposed amendments to the Constitution.

Two recent studies elaborate on the clash between athletic programs and academic programs in America’s colleges and universities. See James L. Shulman and William G. Bowen, “The Game of Life,” Princeton Univ. Press, Princeton, N.J. (2001), and James L. Shulman and William G. Bowen, “Reclaiming the Game,” Princeton Univ. Press, Princeton, N.J. (2003).

This is not the only lawsuit between and among members of the Big East over the withdrawals of members to join the Atlantic Coast Conference. Other suits are pending in Connecticut and relate more to issues about what various parties and institutions did, or did not do, in the process.

The District of Columbia Code, in Sec. 29-301.99, provides that “any action which may be taken at a meeting of the members or directors, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all members entitled to vote with respect to the subject matter thereof... Such consent shall have the same force and effect as a unanimous vote.” (Emphasis added.)

This does not appear to have been a regular or special meeting of the Conference, and it certainly was not the annual meeting.

Given the events during the summer of 2003 regarding the withdrawal of the University of Miami and Virginia Polytechnic Institute from the Big East, particularly the heavy press coverage and speculation about Boston College becoming the next Big East Member to leave, Father Leahy’s comments should hardly have come as a surprise to the assembled Presidents/Chancellors at the subcommittees meeting. Nor should those comments have lulled the Presidents/Chancellors into some form of complacency that Boston College was not going to withdraw from the Big East if given an invitation from the ACC.

The “Directors” mentioned in various places in the Constitution are Athletic Directors from the member colleges and universities, not directors in the sense of being directors in a corporation. See Section 5.02(e).

By-laws of corporate entities often contain distinct provisions solely to govern the amendment process. See 8 Fletcher Cuclopedia of the Law of Private Corporations, Sec. 4173 (2003).

In making this declaration this Court makes no ruling on the issue of whether this $1 million “withdrawal fee” is a proper amount as liquidated damages or is void and legally unenforceable as a penalty.'